**UNITED STATES of America,**
**Appellee,**

v.

**Edward BRILL, Sol Cotliar, Burton Hyman and Joseph Scalza, Appellants.**

**No. 428, Docket 29384.**

United States Court of Appeals
Second Circuit.

Argued May 3, 1965.

Decided Aug. 2, 1965.

———◆———

Gerald H. Abrams, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, John E. Sprizzo, Asst. U. S. Atty., of counsel), for appellee.

Edward Cherney, New York City (Smart, McKay & Cherney, New York City, of counsel), for appellant, Edward Brill.

Albert J. Krieger, New York City, for appellant, Sol Cotliar.

Gilbert S. Rosenthal, New York City, for appellant, Burt Hyman.

Frederick J. Ludwig, New York City (Sharf, Mackell & Hellenbrand, Kew Gardens, N. Y., of counsel), for appellant, Joseph Scalza.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge:

The defendants, Burt Hyman, Sol Cotliar, Edward Brill and Joseph Scalza appeal from judgments of conviction by a jury upon an indictment[1] charging them and other co-conspirators with conspiring to violate section 501(c) of Title 29, United States Code in that they embezzled, stole and converted to their own use and the use of others, funds of labor organizations, namely, Local 229, United Textile Workers of America and Local 819, International Brotherhood of Teamsters.

In general, the basis of the conspiracy was the abstraction of funds from the union treasuries by means of false vouchers and fictitious salary payments to persons who performed no services for the unions. These funds were then wrongfully diverted to the use of the defendants and others.

Although the scheme had many ramifications, in essence, and as revealed by the bookkeeper, Joan Kane, it involved the issuance of false expense vouchers and fictitious salary checks to provide for an excess of $210 a week over the actual union expenses. The participation of the convicted defendants therein was $50 to Brill and $160 (delivered in two envelopes containing $100 and $60) to Cotliar. Hyman, a former officer of Local 229, directed the transmission of the funds. Scalza was the president of Local 819. The merger of Local 77 (formerly Local 229) with Local 819 is of significance only in that the merger negotiations and its consummation required the perpetuation of the fraudulent scheme. Insofar as more specific facts are required in dealing with the errors

---

1. The indictment was filed on June 16, 1964, and superseded an indictment filed on October 24, 1963.

alleged by the individual defendants they will be stated subsequently.

### Cotliar—Sufficiency of the Evidence

Cotliar contends that the Government did not prove that he *knowingly* entered into or participated in the conspiracy and that he is a victim of guilt by association. Although there was testimony that for some fifteen months commencing in late 1959 Cotliar had been given envelopes which had been delivered by Kane to Levin (a former business partner of Cotliar), Cotliar argues "that the mere fact that he allegedly received some of the fruits of the conspiracy does not lead to any legitimate inference that he received it because he had a 'stake in the venture'." His conclusion is that without further proof the jury was required "to make any one of a number of inferences completely consistent with innocence." Cotliar's explanation of the adverse jury result is that it "came about through errors in the admission of evidence * * * and through the innuendo loaded questions consistently asked of witnesses throughout the trial."

■ The evidence claimed to have been erroneously admitted against Cotliar was primarily Scalza's grand jury testimony given on September 24, 1963. Cotliar argues that Scalza's grand jury testimony, and inferentially the adverse testimony of the other conspirators was inadmissible on the ground that the Government failed to present independent evidence to link him to the conspiracy. This argument is answered by Kane's testimony that she left envelopes for "Solly" and by Levin's testimony that Cotliar picked up these envelopes.

■ Cotliar argues that Scalza's testimony before the grand jury was inadmissible hearsay as against him since it was given after the conspiracy to divert union funds had been completed. Although Cotliar asserts that the conspiracy ended in mid-November 1962, there was evidence that payments were continued at least into early 1963. Nor was there any definite termination date placed by the conspirators upon the $210 monthly obligation. Admissibility, therefore, might well be based upon continuation of the conspiracy. However, it is unnecessary to invoke any particular theory because the defendant whose testimony—introduced through a reading of the grand jury minutes—is attacked as hearsay actually took the stand to describe his version of the events. In so doing he subjected himself to cross-examination, thus removing any disadvantage Cotliar might have suffered from not being able to cross-examine in the grand jury room. Moreover, Scalza's testimony at trial covered much the same ground as his testimony before the grand jury and his answers did not deviate materially from those given to the grand jury. Scalza's testimony at trial, therefore, cannot be classed as a hearsay declaration made after termination of the main conspiracy or as concerned primarily with events which took place after the main conspiracy had terminated. That Cotliar's counsel elected not to question Scalza was an exercise of judgment on his part, although at variance with the decisions of counsel for the other three defendants who did cross-examine.

■■ The jury was entitled from all the acts revealed by the testimony to determine whether Cotliar knowingly participated in the conspiracy to embezzle union funds. Was he merely the owner of a bookstore and the unwitting recipient of mysterious envelopes? Or was he more closely affiliated with the other defendants as might be inferred from his frequent appearance at union headquarters, his discussions as to union problems, the meeting with Scalza and Hyman in his hospital room where the "sale" of Local 77 was consummated and where continuing wrongful payments by officers of Local 819 were agreed upon, the undercover method of delivering the envelopes and his inquiries as to whether anything had been left for him? Furthermore, the jury might well have considered for inference purposes why after FBI investigation had commenced did Cotliar want to "get rid

of this mess" and not "want any part of it". From these and other facts, the jury could have found in Cotliar's favor; it did not do so. Absent error in the admission or exclusion of testimony or error in the charge, its verdict must stand because it is not the function of the reviewing court to replace the jury's determination where properly admitted testimony would warrant the result reached.

### Levin's Claim of Fifth Amendment Privilege

█ Levin was an important witness because it was he who testified that Kane gave him the envelopes which Hyman was sending to "Sol" (Cotliar) and which he, in turn, delivered to Cotliar. On the Government's direct examination, Levin was asked about his grand jury appearance and disclosed that he had invoked his rights under the Fifth Amendment and had refused to testify before that body. Cotliar's counsel thereupon moved for a mistrial which motion was denied. Subsequently, counsel on cross-examination brought out the fact that Levin had been threatened with indictment but had been told that he would not be indicted if he testified at trial for the Government. Cotliar argues that the irresistible inference from this testimony is that Levin was guilty and knew of his guilt; therefore, his former business associate, Cotliar, to whom he delivered the envelopes, must also be guilty. Such inferences are always possible where a co-defendant pleads guilty and testifies for the Government. Under such circumstances it is usually standard trial procedure to seek to attack the witness' credibility by showing the advantage he hopes to receive by so doing. Likewise, if there be a criminal record, "it is usually proper and desirable that the party calling a witness with a criminal record should elicit such information on direct examination." United States v. Freeman, 302 F.2d 347, 350 (2 Cir., 1962). The cases upon which Cotliar relies,

Grunewald v. United States, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (*defendant's* use of the Fifth Amendment in prior grand jury testimony used to impeach his credibility at trial); United States v. Gross, 276 F.2d 816 (2 Cir., 1960), cert. denied, 366 U.S. 935, 81 S.Ct. 1659, 6 L.Ed.2d 847 (1961) (*defendant's* use of the Fifth Amendment in prior testimony before a Congressional committee also used to impeach his testimony at trial); and United States v. Tomaiolo, 249 F.2d 683 (2 Cir., 1959) (*defense witness's* use of Fifth Amendment in his prior testimony before grand jury used to impeach his credibility at trial), involve substantially different situations and do not support the proposition that facts affecting credibility of a friendly witness cannot be developed on direct examination within reasonable limits. Nor was the disclosure that Levin was testifying under a grant of immunity in any different category. There was no error in the admission of this testimony.

### Scalza—The Charge

█ Scalza creates his two major appellate points out of a completely specious conception of one sentence of the court's charge. The court did not say to the jury explicitly or by far-fetched inference that it would be a violation of section 501(c) as a matter of law if a union employee used his salary for his own private or personal purposes. The court made it abundantly clear that section 501 (c) "does not prohibit any union officer or employee from using his bona fide salary in any manner he or she may see fit nor does it prohibit the use of bona fide expense accounts in furtherance of union interests." What is prohibited is the charging on the union books of false and fictitious items under the guise of legitimate salary or expense accounts. No further answer is required to such a gross misconception and interpretation of a charge which clearly placed the essential elements of the crime before the jury.

## The Motion for a Severance

Scalza's involvement stems from his employment in January 1961 as an organizer for Local 819. In July 1961 he became its president. In the merger negotiations in early 1962 designed to place the membership of Local 77 into Local 819, the condition was imposed of continuing the $210 a week payments after the merger. There was testimony that this was arranged by placing Scalza's son, Richard, on the union's payroll at $70 a week, authorizing $50 each to Scalza and O'Connor, then the secretary-treasurer of Local 819, as expenses and by increasing their salaries by $20 a week—a total of $210. This amount ($210) Scalza delivered to Hyman.

Although Scalza was only added as a defendant in the June 16, 1964 indictment, he was alleged in this indictment to have "participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses" with his co-defendants within the meaning of Rule 8(b) of the Federal Rules of Criminal Procedure. The propriety of the trial court's denial of the motion for severance was confirmed by the sufficiency of the evidence introduced at trial which linked Scalza to the continuing conspiracy which was the subject of the indictment. Schaeffer v. United States, 362 U.S. 511, 514, 80 S.Ct. 945, 4 L.Ed.2d 921 (1962). There was no error in denying his motion for a severance.

## The Demand for a Bill of Particulars

The decision upon the demand for a bill under the previous perjury indictment did not deprive the trial court of its right to exercise discretion upon the demand under the conspiracy indictment. No reversible error can be attributed to the denial of this motion.

## Hyman

This appellant adopts all points raised by his co-appellant Cotliar (Points II and III) and the other co-appellants insofar as applicable. The same conclusions set forth in this opinion as to the alleged hearsay statements after the asserted termination of the conspiracy and the admission of the testimony of Levin apply with equal force as to Hyman.

## Brill

Brill concedes that the proof discloses that he, as a union employee, participated in a scheme whereby persons who did not in fact work for the union were placed on the payroll, their checks endorsed and cashed by Kane and the proceeds delivered to one or more of the co-defendants. These payroll "dummies" were then discharged after twenty weeks so that they would be eligible for New York State unemployment insurance. Brill places his claim of reversible error upon an incident during the trial and upon an alleged defect in the charge.

## The "currency" incident

This incident occurred when counsel for Hyman, desirous of obtaining a stipulation that an envelope delivered to Levin was "what is known as a regular size envelope" received a reply from the prosecutor, "Can we stipulate that it is about the size of currency?" A motion for a mistrial followed which was denied but the trial court struck the prosecutor's "currency" reply and instructed the jury to disregard it. The ensuing colloquy, much of it out of the hearing of the jury, showed no prejudice on the part of the trial judge against Brill's (or the defendants') case. It was merely an effort to preserve courtroom decorum—an effort which often appears in retrospect to have greater appellate importance than during the heat of battle. As to the remark itself, the jury could not have been so naive and unfamiliar with American currency as not to be able to form its own opinion as to whether American bills would fit into the envelope in question. Whether or not this were so would have been fair argument to the jury by any of the parties. Nothing was,

therefore, brought to the jury's attention that their own eyesight and common sense would not have revealed.

*The Charge*

■ Error in the charge is claimed because of the court's asserted failure to connect the elements of the crime of conspiracy with the elements of the crime specified in section 501(c). Brill concedes that the charge contained excellent discussions of elements of both crimes but contends that the court did not state that the jury must find beyond a reasonable doubt that "the object of the conspiracy was to commit the acts which constitute a violation of section 501(c)." The court first referred to the indictment as charging the defendants "with wilfully, knowingly and unlawfully conspiring to embezzle or convert to their own use or to the use of others in violation of Section 501(c) funds or other assets of certain labor organizations * * * " and that it alleged "that the object of the conspiracy was the violation of Section 501(c)." The court then specifically charged that the jury must find beyond a reasonable doubt that each defendant "knew of the existence and unlawful objective of the alleged conspiracy and that he had the specific intent to assist the conspiracy in attaining that objective." Section 501(c) so far as material was read to the jury thus informing it of the essential elements of the crime. A fair reading of the charge leaves no doubt that the jury was adequately advised that they must find that the object of the conspiracy was to steal and embezzle union funds in violation of section 501(c).

The record is replete with evidence from which the jury could have satisfied itself beyond a reasonable doubt that these defendants were brazenly and illegally using their respective positions to loot the union treasuries by schemes and devices which were most reprehensible.

The judgments of conviction are affirmed.