**Dennis Henry LORAINE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 21079.**

United States Court of Appeals Ninth Circuit.

June 4, 1968.

Rehearing Denied July 18, 1968.

Certiorari Denied Nov. 12, 1968.

See 89 S.Ct. 292.

Russell E. Parsons (argued), Los Angeles, Cal., for appellant.

Anthony M. Glassman (argued), Asst. U. S. Atty., Howard B. Frank, Asst. U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, William M. Byrne, Jr., U. S. Atty., Los Angeles, Cal., for appellee.

Before HAMLEY and ELY, Circuit Judges, and CRARY,* District Judge.

HAMLEY, Circuit Judge:

Dennis Henry Loraine was charged, in three counts, with offenses involving counterfeit government obligations. The first count charged a conspiracy in which Loraine, Edward S. Friedland, Richard Randall, Robert James Terry and Thomas Chambers Windsor Roe were named as co-conspirators.[1] The second and third counts charged substantive offenses, Loraine and Terry being named in count two, and Loraine alone in count three.[2]

Following a jury trial, Loraine was convicted on all three counts. After the imposition of sentence, he took this appeal. He argues here that the evidence is insufficient to support the verdict of guilty on any of the counts and that the trial court therefore erred in denying his motion for judgment of acquittal.

Viewed in a light most favorable to the Government, the evidence reveals the fol-

---

* The Honorable E. Avery Crary, United States District Judge for the Central District of California.

1. In this count the five were charged with having agreed, confederated and conspired with each other and with other unnamed individuals, during a period extending from prior to April 25, 1965 to August 5, 1965, to: (1) pass, utter, publish, sell, possess and conceal counterfeit obligations of the United States with intent to defraud, in violation of 18 U.S.C. §§ 371 and 472 (1964), and (2) buy, sell, exchange, transfer, receive and deliver such counterfeit obligations, with intent that the same be passed, published and used as true and genuine, in violation of 18 U.S.C. §§ 371 and 473 (1964). Thirty overt acts were alleged.

2. In the second count, Loraine and Terry were charged with having kept in their possession and concealed, with intent to defraud, falsely made and counterfeited obligations of the United States, namely 3762 counterfeit one hundred dollar federal reserve notes in the total face amount of $376,200, in violation of section 472. In the third count, Loraine was charged with having transferred and delivered the same false and counterfeited obligations to Terry, with the intent that the same be passed, published and used as true and genuine, in violation of section 473.

**337**

lowing circumstances and events: Beginning in late April 1965, Loraine and the alleged co-conspirators participated in a series of meetings, carried on extensive correspondence and telephone communications, and engaged in foreign and domestic travel in an effort to obtain and use counterfeit money in large amounts. The prime purpose of this undertaking was to overcome serious personal financial difficulties being experienced by Loraine and Roe.

The initial efforts in this direction, pursued during late April, all of May and most of June, 1965, proved abortive. However, after Randall introduced Loraine to Terry in Los Angeles on June 27, 1965, they began to achieve positive results. About July 5, 1965, Loraine, Terry and Joel Lee, Terry's attorney, had dinner together in Florida. During the dinner Loraine stated that Roe was in temporary financial difficulty and needed about one million dollars.

At a subsequent meeting, Lee told Loraine that he had a source that could supply Roe's needs. Loraine expressed interest and Lee said that he would attempt to obtain samples of what could be supplied. Later that week Loraine telephoned Terry and requested him to call Lee and ask if Lee had "done anything" with regard to Roe's problem. Loraine further instructed Terry to tell Lee "if he had not been able to locate or come up with any samples * * * to forget about it." Terry reported back to Loraine that Lee hadn't been able to obtain anything.

About July 18, 1965, Loraine received a telephone call from Terry in Florida. Terry said that $500,000 in counterfeit money in one hundred dollar denominations of United States currency could be made available upon short notice, and up to $5,000,000 could ultimately be made available. Loraine was advised that Joel Lee was Terry's contact for the counterfeit money.

On July 25, 1965, Roe, then in Europe, telephoned Randall in Los Angeles and said he had to speak to Loraine urgently. Randall gave this message to Loraine who told Randall that he had finally found what he was looking for. Loraine told Randall that he had found counterfeit American money through Terry. Loraine stated to Randall that Terry's contact, Joel Lee, had made arrangements to print counterfeit one hundred dollar bills and that in the previous ten days or two weeks the money had been printed.

About July 26, 1965, Loraine asked Terry to pick up Lee at the Los Angeles airport. Terry did so and the two proceeded to Mickey Hargitay's house in Los Angeles, where Loraine was staying. After Lee and Loraine had met in a bedroom at the Hargitay house, Lee went to the automobile to get his briefcase and then returned to the bedroom. Loraine was not then in the bedroom, but Terry entered the room. Terry observed quite a few one hundred dollar bills in United States currency neatly stacked in Lee's open briefcase.

Later in the day Terry and Lee met Loraine at a coffee shop and Loraine there told Terry that Roe, then in Switzerland, was interested in seeing Terry regarding the film "Blues for Mr. Charley." [3] Loraine also asked Terry if he could leave the next day for Switzerland. After working out financial details, Loraine told Terry to telephone Roe in Switzerland and inform him that Terry was to go over there. In addition to discussing film matters, Loraine told Terry that he could do him a great favor by taking with him some papers that Loraine had to get to Roe.

Lee and Terry then went to Terry's motel room and while Terry was packing Lee handed him three packages tightly wrapped in newspaper. Each package was light in weight and the size of a large book. Terry put the three packages in

3. Loraine, Randall, Roe and Terry were all interested in various phases of the motion picture business.

his overnight bag and left that evening by plane for Geneva, via Paris.

On the same day, July 26, 1965, Loraine told Randall that about $500,000 in counterfeit one hundred dollar bills was on the way to Roe in Switzerland with Terry as courier. Loraine also told Randall that he only paid for those bills that looked good since some of them had not come out too well. Loraine asked Randall to telephone Roe and tell him there would be no charge for the poor quality counterfeit bills which had been included in the packages. Loraine also told Randall to tell Roe that he should pay Terry $5,000 in genuine bills as a fee for taking the counterfeit money to Roe. Roe was also to send Loraine $55,000 after Roe cashed the counterfeit money. This latter sum was to cover the balance due to the suppliers of the counterfeit money.

Randall telephoned Roe and relayed this information to him, advising that Terry would reach Switzerland the next day. Randall also told Roe that Loraine had found that $200,000 of the counterfeit money was defective but that Roe would receive $300,000 in well-printed counterfeit bills. Randall explained to Roe that Terry was also delivering to Roe $75,000 of the poor-quality counterfeit bills in case Roe could do anything with it.

Terry entered Roe's office in Lausanne, Switzerland on the morning of July 28, 1965. They first discussed film matters. Terry then told Roe that he was instructed to give him the contents of the briefcase which Terry had with him at the time. Terry put the three packages on the table and then stepped out of the room to give Roe's secretary his plane ticket.

Shortly afterwards, Terry reëntered Roe's office. At that time, Roe was standing behind his desk examining a large pile of one hundred dollar bills. Terry told Roe that the counterfeiting was done in a great hurry at Loraine's request and the ink was not dry before the packages were put together. Terry also stated that the paper was not the best quality and that in some of the bills the numbers were blurred.

Terry told Roe that it was Lee's advice not to put the money into circulation in Europe, it apparently being the understanding of Lee and Loraine that it was only to be posted as collateral to secure loans. Abiding by Loraine's instructions, Roe gave Terry $5,000.

Roe subsequently exchanged $5,900 in counterfeit bills into Swiss francs at four banks in Geneva. At the fifth bank he visited the cashier refused to exchange a substantial number of bills, asserting that they were counterfeit. In view of this development, Roe telephoned Loraine and stated that he could not send him the $55,000 which Loraine had requested. Loraine replied that without the money he would be in trouble with his suppliers.

Terry returned to Los Angeles about July 28, 1965, and gave Loraine an account of Terry's meeting with Roe. Loraine later had a conversation with Randall at Hargitay's house in Los Angeles. He told Randall that he could not understand why Roe was passing the counterfeit money instead of using it for collateral, unless Roe was trying to implicate Loraine. Loraine also told Randall that the money had been made to order and that about ten million dollars worth of one hundred dollar bills had been made.

▇▇▇ Having in mind the asserted weaknesses in the Government's case, as developed in detail in Loraine's briefs on appeal, we hold that the evidence tending to support the verdict, only the highlights of which are reviewed above, amply supports the verdict on count one (conspiracy) and count three (transfer and delivery) of the indictment. We need not consider whether the evidence pertaining to count two (possession and concealment) was sufficient, since the sentence on count two is concurrent with that on count three. See Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321; Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Browning v. United States, 9 Cir., 366 F. 2d 420, 422.

At the close of the Government's case counsel for Loraine moved to dismiss the indictment on the ground that, during the presentation of the Government's evidence to the grand jury, the United States Attorney wilfully suppressed evidence which was in his possession. This evidence, counsel asserted, would have had a material bearing upon the credibility of three witnesses who appeared before the grand jury. Specifically counsel charged, the United States Attorney failed to reveal to the grand jury that witness Max Desatnick had had a criminal record and was then under indictment in three or four additional cases; failed to reveal that witness James McKee had been charged with embezzling $85,000 from Cadco Company of Great Britain; and failed to reveal that witness Randall had been permanently enjoined by the State of New York from selling or dealing in securities. Loraine contends that the trial court erred in denying this motion.

The suppression by the prosecution at the trial, of evidence favorable to an accused violates due process where the evidence is material either as to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763, 765. Evidence available for use at the trial may be material within the meaning of this rule, even though it goes only to the credibility of a witness. See Napue v. People of State of Illinois, 360 U.S. 264, 269–270, 79 S.Ct. 1173, 3 L.Ed.2d 1217. It is usually proper and desirable that the Government should bring out on direct examination, at the trial, the criminal record of its witnesses or any circumstances tending to undermine their credibility, although, on objection of the accused, such evidence may be excluded on direct examination.

See United States v. Brill, 2 Cir., 350 F.2d 171, 174; United States v. Freeman, 2 Cir., 302 F.2d 347, 350.[4]

However, the duty of prosecuting authorities at the trial, and their duty when presenting a case before a grand jury, are not necessarily the same. Thus, an indictment, if returned by a legally constituted and unbiased grand jury and valid on its face may not be dismissed because it is based upon hearsay testimony (Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397), incompetent evidence (Holt v. United States, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021), or illegally seized evidence (United States v. Blue, 374 U.S. 251, 255, n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510).

Similarly, we hold that the trial court did not err in refusing to invalidate a federal indictment because the Government did not produce before the grand jury all evidence in its possession tending to undermine the credibility of the witnesses appearing before that body. Loraine was accorded the full protections of the Fifth and Fourteenth Amendments when, at the trial on the merits, he was permitted to expose all the facts bearing upon his guilt or innocence.

Loraine argues that the trial court erred in denying his motion for dismissal of the indictment upon the ground that there had been publicity and news reporting incident to the trial which was not accurate or truthful and did not fairly reflect the court proceedings.

During the extensive voir dire examination of the jury, counsel for co-defendant Friedland, in the absence of the jury, moved for a mistrial on the ground that an article which appeared in a local newspaper reported that Friedland's wife had testified as to misconduct on the part of jurors. Counsel for Loraine joined in that motion.

---

4. During Desatnick's direct testimony at the trial, Government counsel attempted to place before the jury Desatnick's unsavory background by inquiring into his criminal record. However, counsel for Loraine objected on the ground that the Government was attempting to impeach its own witness, and the objection was sustained.

**340**

The jury was called back and the trial court asked that any juror who had read in a newspaper or listened to a broadcast about the trial within the last thirty-six hours hold up his hand. No hand appeared and the motion was denied. A similar motion was made the next day, based on a similar article in another local newspaper. The motion was denied without an inquiry of the jury being made.

A day or two later two motions for mistrial were made on the ground that an article which appeared in a Los Angeles newspaper contained "misstatements and inaccuracies" about the trial. Counsel did not state what had been misstated or was inaccurate, nor that Loraine had been prejudiced and, if so, how. Both motions were denied.

At the close of the Government's case counsel for Loraine joined in a motion renewing the prior motion for a mistrial and made a new motion to dismiss the indictment. Both motions were made on the ground that there had been continuous inaccurate, untruthful publicity and news reporting which did not fairly reflect the court proceedings. A sheaf of newspaper clippings was submitted to the court. Again, counsel did not state what was inaccurate and untruthful about the publicity, nor that Loraine or any other defendant had been prejudiced and, if so, how. The motions were denied.

In arguing on appeal that the trial court erred in denying the latter motions, counsel for Loraine again refrains from explaining what was inaccurate or untruthful about the publicity, or wherein Loraine was prejudiced by such publicity. Counsel does not even assert that any juror saw or heard any of this publicity. Nor does he take note of the fact that the trial court assiduously asks the jury not to read anything or listen to any broadcasts about the trial.

We find here no circumstances remotely approaching those which brought about reversals in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and Estes v. State of Texas, 381 U.

S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. The trial court did not err in denying the motion for mistrial and the motion to dismiss the indictment.

Affirmed.