UNITED STATES of America, Plaintiff,

v.

Lee LINTON, Sorkis J. Webbe, Fred L. Kennedy, Robert C. Tindell, Aladdin Hotel Corporation, Dennis Piotrowski, Del E. Webb Corporation, James R. Comer, Defendants.

No. CR–R–80–24–ECR.

United States District Court,
D. Nevada.

July 23, 1980.

B. Mahlon Brown, U. S. Atty. by Geoffrey A. Anderson, Las Vegas Strike Force, Las Vegas, Nev., and Marvin L. Rudnick, U. S. Dept. of Justice, Los Angeles Strike Force, for plaintiff.

Albert J. Krieger, Miami, Fla., for Sorkis J. Webbe.

V. Devoe Heaton, Heaton & Wright, Las Vegas, Nev., for Fred L. Kennedy.

Oscar B. Goodman, Goodman, Oshins, Brown & Singer, Chartered, Las Vegas, Nev., for Robert C. Tindell.

James M. Shellow and James R. Glover, Shellow & Shellow, Milwaukee, Wis., for Aladdin Hotel Corp.

James A. Twitty, Beverly Hills, Cal., for Dennis Piotrowski.

Samuel S. Lionel and John R. Lusk, Lionel, Sawyer & Collins, Las Vegas, Nev., for Del E. Webb Corp.

James F. Duncan and Robert B. Best, Jr., Kansas City, Mo., for James R. Comer.

## ORDER

EDWARD C. REED, Jr., District Judge.

Defendants Del E. Webb Corporation (DEW), Aladdin Hotel Corporation (Aladdin), Sorkis J. Webbe, Fred L. Kennedy, Robert C. Tindell, Dennis Piotrowski, and James R. Comer have moved to dismiss the indictment in this action. The principal grounds advanced for these motions are the Fifth Amendment to the United States Constitution and the Court's inherent supervisory power, as recently discussed in

*United States v. Samango,* 607 F.2d 877 (9th Cir. 1979). An extensive hearing has been held on the motions by the Court which now renders its decision on the same.

A forty-three count indictment was returned by the Special Grand Jury on September 4, 1979, after meeting with the government prosecutor and receiving evidence including live oral testimony on five separate occasions. The indictment avers violations of Title 18 of the United States Code §§ 371, 1341, 1343, 2314, 1951, 1962(c), as well as Title 26 § 7201. The crimes alleged to have been committed include mail and wire fraud, interstate transportation of money with intent to defraud, conspiracy to commit the three aforesaid offenses, interference with commerce by extortion, conducting of an enterprise through a pattern of racketeering activity and several counts of tax evasion as to defendant Lee Linton only. Defendants DEW and James R. Comer are only charged in Count I, the conspiracy count of the lengthy indictment.

The gravamen of the Government's case as alleged in the indictment is that the eight named defendants were each involved in a scheme whereby portions of the proceeds from loans made by the Pension Fund of the Teamsters Union for the purpose of financing a construction project at the Aladdin Hotel in Las Vegas were secretly and improperly diverted by the defendants. The defendant DEW was the general contractor in the Aladdin construction project. Lee Linton was project architect for the Aladdin; Fred L. Kennedy was inspecting architect for the Pension Fund; Sorkis J. Webbe was general counsel for the Aladdin; James R. Comer was a corporate officer for DEW; while Dennis Piotrowski and Robert C. Tindell were employees of the Aladdin.

The alleged scheme involved, inter alia, a complex series of transactions initiated by the defendants whereby subcontractors on the construction project were induced to enter into contracts for inflated amounts, thus allowing for "kickbacks" to be routed directly back to some of the defendants, as well as to sources designated by some of the defendants. Such funds were to be paid subsequent to the submission of pay requests to the Pension Fund ostensibly for work completed.

The case was submitted to the indicting grand jury under what the Government concedes was " . . . a slightly unusual set of circumstances . . . ". Investigation in this case involved testimony and evidence presented to a regular federal grand jury in Tucson, Arizona, as well as regular and special federal grand juries sitting in Las Vegas over the course of approximately two-and-one-half years. No indictments were ever returned by any of the previous grand juries investigating the case. In June, 1979, the term of the Las Vegas Special Grand Jury then investigating the matter was about to expire. An extension for the term of that grand jury was sought by the Government but denied by the Court. A new Special Grand Jury was then impaneled on August 8, 1979. Testimony and evidence in this matter was then presented to the new grand jury which returned the subject indictment after meeting on August 14, 21, 27, 28 and September 4, 1979.

Three Government agents appeared as witnesses before the indicting grand jury and explained and summarized the evidence and testimony of the some 150 witnesses who had appeared before the prior federal grand juries investigating the case. In addition, Charles Chuckray, Director of Loan Administration for the Pension Fund, gave testimony in respect to voluminous records and documents regarding the subject loan transactions. Transcripts of testimony of witnesses who appeared before prior grand juries were made available to the indicting grand jury. Numerous exhibits were also presented.

It is the position of the defendants that the summary procedure utilized by the Government in presenting its case to the grand jury was so abused as to constitute a totally unjustifiable manipulation of the indicting grand jury all to the prejudice of the defendants. This allegedly manipulative and improper procedure, according to

the movants, was primarily accomplished in two ways:

1. By a highly selective and deceptively prejudicial summary of only a fraction of the prior grand jury testimony and evidence; and

2. Through knowing use of material false testimony by a Government agent.

Additional grounds submitted by defendants in these motions will also be addressed.

Here, as in *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979), the case relied on most heavily by the defendants in bringing these motions, the defendants contend " . . . that the prosecutor's behavior was so improper and prejudicial that it created a biased grand jury."

In support of their motions the defendants point to numerous examples of what is asserted as prosecutorial misconduct during the course of proceedings before the indicting grand jury and further have designated several portions of testimony given before the Special Grand Jury as false. Among these the major points are that:

1. The Government never informed the indicting grand jury of a credibility problem with a principal government witness appearing before a previous grand jury whose testimony was included in the summaries given. Donald H. Bayles was a former employee of defendant DEW who was purportedly hospitalized and diagnosed as suffering from depressive neurosis and acute paranoid schizophrenia soon after the events which were the subject of his testimony occurred.

2. The defendant DEW agreed to pay a finder's fee to William Morris, an attorney in Kansas City. The Government's presentation implied that the agreement was useless and was designed to hide an unearned commission since the defendant DEW already knew of the Aladdin project, and that it was not paid simply because William Morris died. Defendant maintains that undisputed evidence presented before prior investigating grand juries showed that the purpose of the agreement was to allow defendant DEW to negotiate a bid contract with the Aladdin to be general contractor on the construction project without competitive bidding. Defendant also asserts that a Government agent deceptively testified before the indicting grand jury that there were no other serious bidders on the job.

3. The Government agents testimony deceptively indicated that more than one finder's fee agreement was prepared by the Aladdin and that "at the time these documents [for a second finder's fee agreement] were prepared, Donald H. Bayles, house counsel for DEW, resigned out of conscience."

4. Testimony by the Government agent before the indicting grand jury misleadingly implied that a $225,000.00 redesign architect fee included in the general contractor contract between defendant DEW and Aladdin was unusual and was intended by the parties as a means of paying kickbacks. Such testimony also included the false statement that the redesign architect fee was included in the contract contrary to the advice of a DEW legal advisor.

5. Government agent Cohen also falsely testified that defendant Comer, a corporate officer of DEW, signed letters of intent to subcontractors which included amounts for kickbacks and that DEW submitted pay requests to the Pension Fund which included amounts for kickbacks.

6. That agent Cohen also falsely testified that prior evidence submitted showed that $900,000.00 was diverted to the architect on the job and the *general contractor.*

7. The Government misled the indicting grand jury by presenting summary testimony calculated to have the grand jury believe that any act by a person purportedly acting on behalf of the corporation was an act of the corporation without further informing the grand jury that a corporation need benefit from the criminal acts of its agents in order to be held criminally liable.

8. The inclusion of defendant Tindell in the instant indictment is the result of

prosecutorial vindictiveness in that subsequent to being told that he was not then a target of the investigating grand jury, Tindell appeared and testified before the grand jury and invoked his Fifth Amendment right against self-incrimination. The attitude of the Government toward him then changed and Tindell was indicted along with the other defendants in this case.

9. The defendants were prejudiced by a general discussion of organized crime occurring between the prosecutor and the grand jury immediately prior to the Government's presentation of evidence in this case before the indicting grand jury.

10. The Government prosecutor improperly appeared as an unsworn witness before the indicting grand jury.

DISCUSSION:

"The Fifth Amendment provides that federal prosecutions for capital or otherwise infamous crimes must be instituted by presentments or indictments of grand juries. But neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act." *United States v. Costello*, 350 U.S. 359, 361, 76 S.Ct. 406, 407, 100 L.Ed. 397 (1956).

"Implicit in the [above stated] Fifth Amendment [provision] is the guarantee that a grand jury which presents or indicts will be fair and unbiased." *United States v. Gold*, 470 F.Supp. 1336, 1345 (N.D.Ill. 1979).

As accurately stated in *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974), "Today, the grand jury relies upon the prosecutor to initiate and prepare criminal cases . . . which come before it." Professor Moore thoughtfully has written that, "The passive role of the modern grand jury is perhaps an inevitable function of our complex urban society. Nevertheless, at its best the grand jury is capable of acting as something more than a rubber stamp." 8 Moore, *Federal Practice*, ¶ 6.02[1] 6–12 (1976). "Thus, *Costello* stands only for the proposition that courts should not inquire into the substance of the evidence presented to the grand jury. Courts can still play a role, however, in ensuring the fairness and independence of that body." *United States v. Leverage Funding Systems, Inc.*, 478 F.Supp. 799 (C.D.Cal.1979).

In recent years the Ninth Circuit has become more willing to review serious allegations involving prosecutorial misconduct and to dismiss an indictment where such action is necessary "to protect the integrity of the judicial process." *United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir. 1977). Such dismissals have been based either on constitutional grounds, *United States v. Basurto*, supra, or on the court's inherent supervisory power, *United States v. Owen*, 580 F.2d 365 (9th Cir. 1978), *United States v. Samango*, supra, or both, see *United States v. DeMarco*, 401 F.Supp. 505 (C.D. Cal.1975), *United States v. Roberts*, 481 F.Supp. 1385 (C.D.Cal.1980).

It was in the concurring opinion of Judge Hufstedler in *United States v. Basurto*, 497 F.2d at 794, that use of the court's inherent supervisory power in a context similar to the instant case was suggested initially in this circuit where:

"A supervisory rule requiring a prosecutor who learns before trial that an indictment is based in some material way on perjured testimony to seek dismissal of the tainted indictment would safeguard the grand jury's role as mediator between prosecutor and potential defendant."

In *United States v. Owen*, supra, the use of the court's supervisory power in such a context involving Governmental misconduct was adopted so that now " . . . dismissal is used as a prophylactic tool for discouraging future Governmental impropriety of a similar nature." As later held by the court in *United States v. Samango*, supra, 607 F.2d at 884, the Government's use of perjured testimony is not necessary in order to invoke the court's supervisory power in that "The facts of each case determine when Government conduct has placed in jeopardy the integrity of the criminal justice system."

While the Supreme Court has not yet announced a general rule regarding application of the Court's inherent supervisory authority, "numerous rationales have been advanced to explain the nature and scope of the somewhat sparingly used supervisory authority, but it is generally conceded '. . . that the courts are primarily concerned with protecting the judicial process from the stigma of illegal or unfair government conduct.'" *United States v. Narciso*, 446 F.Supp. 252, 302 (E.D.Mich. 1976).

■ It is also important to note that the drastic nature of the harsh remedy provided by the court's exercise of its supervisory powers in dismissal of an indictment based on prosecutorial misconduct " . . . renders it essential that they not be applied indiscriminately to remedy every prosecutorial misstep." *United States v. Baskes*, 433 F.Supp. 799, 806 (N.D.Ill.1977), *accord: United States v. Dondich*, 460 F.Supp. 849 (N.D.Cal.1978). As such, the policy of the federal courts is that of reluctance to interfere in the orderly functioning of grand jury proceedings and the rule in the Ninth Circuit as found in *United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977), is that:

> "Nevertheless, given the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in law and fact for doing so."

■ It is also the law in this circuit that in order to obtain a dismissal of an indictment based on serious prosecutorial misconduct that, "there be some prejudice to the accused by virtue of the alleged acts of misconduct." *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978).

In *United States v. Chanen*, supra, 549 F.2d at 1309, the court also observed that: "Almost every court dealing with the issue raised here has confronted a novel set of facts. The range of prosecutorial conduct capable of inspiring allegations of unfairness appears unlimited." Here as in *United States v. Samango*, supra, 607 F.2d at 884, the defendant advances the argument that the cumulative effect of the acts and indiscretions herein described, " . . . none of which alone might have been enough to tip the scales, operated to the defendant's prejudice by producing a biased grand jury."

It is significant to note at the outset that both *Samango* and *Chanen* were cases which involved multiple indictments. Although investigation of the instant matter was conducted over a substantial period of time and before several grand juries, only one indictment was ever presented and returned. The second indictment in *Chanen*, as here, was obtained entirely through use of hearsay evidence and the court found that dismissal was not necessary in order to preserve the integrity of the judicial process and to avoid any fundamental unfairness. The facts presented to the court in both *Chanen* and *Samango* differ materially from the instant case and in the eyes of this Court the level of prosecutorial misconduct, if it can be called that, in this case falls somewhere in between the gross indiscretions presented in *Samango* which the court found sufficient to dismiss and those in *Chanen* which were not.

The so-called "credibility problem" discussed by the court in *Samango* was but one of the elements found there by way of comparison as not being present in *Chanen*. Such a problem does not exist in this case. The defendants contend that Donald Bayles, one of the Government's principal witnesses who appeared before one of the prior grand juries, and whose testimony was included in the summary testimony presented to the indicting grand jury, was hospitalized and diagnosed as suffering from depressive neurosis and acute paranoid schizophrenia soon after the events with regard to which he testified. Apparently no evidence pertaining to the credibility of Bayles was ever presented to any of the grand juries which heard the matters involving this case.

■ It is well settled that the prosecutor need not present material bearing on credibility of witnesses appearing before the grand jury. *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978), *Loraine v. United States,* 396 F.2d 335 (9th Cir. 1969), *United States v. Brown,* 574 F.2d 1274, 1276 (5th Cir. 1978). In *Chanen* a potential credibility problem was averted as transcripts of testimony before previous grand juries was read aloud to the indicting grand jury but the prosecutor advised the grand jury that such witnesses had made statements inconsistent with the transcribed testimony.

Conversely, in *Samango,* 607 F.2d at 881, transcripts of the prior testimony of Government witnesses "were merely deposited with the grand jury, and the record does not show how much time the jurors spent with the transcripts nor whether they read them at all." Upon initially reading the above cited passage from *Samango* within its context it is easy to interpret disapproval by the Ninth Circuit of the practice of merely depositing transcripts of prior grand jury testimony with a grand jury without either reading such materials aloud or at least giving the body adequate time to review the contents thereof.

The real danger in *Samango,* though, is made clear in the District Court's opinion, *United States v. Samango,* 450 F.Supp. 1097 (D.C.Haw.1978). It was not that the grand jury returning the second indictment did not read the deposited transcripts, but the possibility that they might have been prejudiced and misled by the contents of such transcripts. Testimony from a witness who had a long history of drug abuse which the district judge had found substantial reason to believe unreliable was also contained in the transcripts deposited with the grand jury in *Samango.* These circumstances differ greatly from the case at bar and this Court finds that the prosecutor was not obligated to present materials regarding Bayles' credibility to the indicting grand jury and that the Special Grand Jury was not overreached or deceived as to the Government's summary of Bayles' testimony before a prior grand jury.

■ The defendants concede that under *Costello v. United States,* supra, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), the Government may obtain a valid indictment based solely on the hearsay testimony of its agents. As such, an indictment may be obtained subsequent to only summary testimony being presented to the indicting grand jury. *United States v. Barone,* 584 F.2d 118 (6th Cir. 1978), *United States v. Gaskill,* 491 F.2d 981, 985 (8th Cir. 1974). There being no requirement for the Government to have presented the transcripts of the prior grand jury testimony summarized by Government agents before the indicting grand jury, the Court does not find as germane the issues raised by defendants as to the amount of time, if any, spent in reviewing the transcripts deposited. This is simply not a case such as *Samango* where the court was concerned not with whether the indicting grand jury might not have read prior grand jury transcripts deposited but rather the potentially prejudicial effects which might have resulted from the grand jury's actually having read the contents of such transcripts. As stated in *Costello,* "Neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act."

Of course, this finding does not affect our adherence to the long line of cases which recognizes the duty of good faith on part of the prosecutor with respect to the court, the grand jury and the defendant. See *United States v. Basurto,* supra, 497 F.2d at 786. The Court further recognizes, however, that the danger of creating a biased grand jury through a false or misleading summary of prior grand jury testimony is greater in a case where transcripts of the prior testimony is neither read aloud to or provided for review to the indicting grand jury. Neither does this finding affect the Court's present inquiry as to whether the specific instances designated by the defendants or this motion constitute prejudicial misconduct on the part of the prosecutor which had the cumulative effect of creating a biased grand jury.

The defendants maintain that the testimony of the Government agent regarding the finder's fee agreement between defendant DEW and St. Louis attorney William Morris was calculatedly presented so as to imply that the agreement was intended to serve no useful purpose and was created to disguise unearned compensation as the defendant DEW had learned of the Aladdin job well in advance of entering in the agreement. A portion of the testimony by Government agent Jeff Cohen currently under attack follows:

Q Mr. Cohen thank you for reading the letter. That purports, then, to be a letter memorializing a finder's fee for finding Del Webb Corporation as the general contractor and assisting in negotiations payable to a William Morris; is that correct?

A That's correct.

Q In your investigation, did you find any significant services performed by Mr. Morris or his law firm with respect to locating the Del E. Webb Corporation in negotiating the contract on their behalf?

A No, sir, to the contrary. In light of the memo that I just read prior to this agreement, it would appear that the Del Webb Corporation was well aware of this project almost six months prior to this agreement.

DEW asserts that unanimous prior grand jury testimony by DEW employees established that the finder's fee agreement was made strictly for the purpose of obtaining the job for DEW as general contractor on a negotiated contract rather than a competitive bid basis. DEW contends that the reason why the finder's fee was never paid was not because attorney Morris died, as stated in the Government's summary testimony, but because the general contractor for the Aladdin job was obtained on a competitive bid basis.

█ It appears that the evidence presented on these points before prior grand juries was not unanimous. While a prosecutor has a duty to present to a grand jury evidence which clearly negates guilt, *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610 (N.D.Okl.1977), the Government is not obligated to sift through all the evidence to find statements or documents that might be exculpatory. *Loraine v. United States, supra,* 396 F.2d 335, *United States v. Mandel,* 415 F.Supp. 1033 (D.C.Md. 1976), "The prosecutor does not have a duty to present defendant's version of the facts." *United States v. Olin Corporation,* 465 F.Supp. 1120 (W.D.N.Y.1979).

For the same reasons, the bulk of defendant's contentions regarding Government testimony as to the motive and propriety for the inclusion of a clause in the general contract between the defendants Aladdin and DEW providing for a $225,000.00 "redesign fee" to be paid to the project architect, defendant Linton, are not significant. The Court does find, however, that the statement made by agent Cohen before the grand jury that the redesign clause was placed in the general contract "contrary to the advice of Del E. Webb Corporation's legal advisors," made at the conclusion of the presentation to the indicting grand jury was not based in fact.

Finally, the Court examines two other instances where summary testimony elicited by the Government before the indicting grand jury purportedly contained substantial misstatements of fact. Both of these instances occurred during agent Cohen's second appearance before the indicting grand jury, where just prior to presenting the indictment the Government sought to summarize the criminal acts with which each defendant was being charged. Agent Cohen stated that "James R. Comer, [vice-president of Del E. Webb] signed certain letters of intent which when executed, furthered the scheme to defraud the Fund." He also testified that "Facts gathered to date indicate that the Aladdin Hotel Corporation participated in diverting approximately $900,000.00 to their project architect and general *contractor.*" Contrary to the insistence of defendant, the Court finds that neither of these statements were made for the purpose of intentionally deceiving or misleading the grand jury and taken in toto such remarks do not constitute knowing use of perjured testimony before a grand jury.

In the second instance a careful reading of the indictment and testimony presented to the indicting grand jury reveals that the Government neither charged defendant DEW with nor did it attempt to show that DEW, the general contractor received any of the $900,000.00 which the Government claims was improperly diverted in this case. More importantly, it is also apparent that this statement was made during the Government's summary of acts attributable to the defendant Aladdin not DEW. Given this context the explanation contained in the affidavit of agent Cohen filed with this motion is all the more plausible. Cohen states that he meant to say that the facts indicate that $900,000.00 was diverted to the project architect and general *counsel* (defendant Sorkis Webbe) of the Aladdin, not the general contractor DEW.

Likewise, Cohen's statement that a corporate officer of Webb, (defendant James R. Comer), signed letters of intent is an insignificant and technical misstatement. Evidence presented to the indicting grand jury showed that Comer did author one such letter of intent involving a contract with a subcontractor and also that he did initial a separate letter of intent which was actually signed by a subordinate, Robert Whitacre. Other evidence presented to the grand jury also indicated that Comer signed other documents allegedly evidencing participation in the underlying fraud scheme.

█ Although none of the errors and misstatements discussed above, especially the representation that the architectural redesign clause was placed in the general contract against the advice of the defendant's legal counsel, are to be commended and can be viewed as anything other than unfortunate if not inexcusable mistakes, taken together these alleged errors do not constitute a case of serious prosecutorial misconduct. In *United States v. Scheufler*, 599 F.2d 893, 895 (9th Cir. 1978), a Government agent testified before a grand jury that the defendant had participated in marijuana and hashish transactions that had yielded large sums of money for him. In moving to dismiss the indictment the de-

fendant alleged that the testimony questioned was improper and prejudicial but the court found that:

"This testimony of [government agent] Anderson, even if attributable to the Government, fell far short of Government misconduct that we have held sufficiently egregious to require dismissal of the indictment."

Although it is clear that under *Samango* prosecutorial misconduct need not be intentional in order to mandate dismissal of an indictment, the misstatements above discussed are not, standing alone, sufficient to require a dismissal of this action as to defendants DEW and Comer. This Court finds as did the court in *United States v. Vargas-Rios*, 607 F.2d 831, 835 (9th Cir. 1979), when also faced with prosecutorial misstatements before a grand jury on a motion to dismiss that:

"This is not a case in which dehors the misstatements there was a complete absence of evidence before the grand jury."

The issue raised by defendant Aladdin regarding the failure of the prosecutor to inform the grand jury that the Aladdin need benefit from the alleged criminal acts of its agents in order to be liable in this action is a matter which should properly be presented to the trier of fact.

The thrust of the defendant's argument is that since the Aladdin is responsible for repayment of the sums borrowed from the Pension Fund that it is in fact a victim of the alleged scheme involving kickbacks paid out of the loans and diverted for purposes not relating to the construction project. The Government points out that the Aladdin benefited from the series of transactions questioned in that it had a high-rise addition built. Whether the Aladdin was a victim or beneficiary of the events involved in this action necessarily involves a determination of facts and evidence which cannot now be made.

Defendant Tindell's position that the Government's inclusion of him in the indictment was the result of prosecutorial vindictiveness has been well supported by pertinent authority. Unfortunately, the defend-

ant has only presented a vague factual background to support this claim. Thus, under these circumstances, neither the interests of justice nor the doctrine of "manifest justice" would require dismissal. Having not been presented with sufficient facts to decide this issue, defendant Tindell's claims on this point are also best left to the trier of fact. See *United States v. Olin Corp.*, supra, 465 F.Supp. 1120.

Subsequent to receiving transcripts of the prosecutor's colloquys with the indicting grand jury the defendants have now advanced two additional bases to support a finding of prosecutorial impropriety occurring before the indicting grand jury. Firstly, the defendants maintain that a brief discussion regarding organized crime between the prosecutor and the grand jury, which took place just prior to when the indicting grand jury began taking evidence in this case, was extremely prejudicial to them.

A reasonable reading of the transcript reveals that the remarks made by the prosecutor about organized crime, taken in context, were entirely proper. Having been just recently impaneled it was logical that one of the grand jurors would ask the prosecutor for a definition of organized crime since the Special Grand Jury was impaneled solely for the purpose of hearing matters presented by the Las Vegas Strike Force. The remarks by the prosecutor were made strictly in response to a juror's question and were not intended to be applied to this action, which was then about to be presented. Rather, the prosecutor's remarks and the underlying question were regarding the general nature of the matters which the Special Grand Jury would be hearing over the course of its entire term. It would be difficult indeed to infer prejudice to these defendants in this instance.

Finally, the defendants have also pointed to portions of the colloquys and transcripts of testimony given before the indicting grand jury and now contend that the prosecutor acted in certain instances as an unsworn witness in rendering testimonial evidence before the indicting grand jury.

Upon review of the relevant transcripts it is the court's view that this claim, too, is unfounded. Due to the complex nature of this case it is hardly surprising that the grand jurors frequently asked questions. While in most instances the prosecutor would attempt to answer, on several occasions he would instruct the grand juror that evidence submitted later in the Government's presentation would answer the question. Most importantly, it appears that in instances where the prosecutor did answer, the responses given consisted of information which was otherwise presented to the grand jury in the form of sworn testimony and documentary evidence and not solely through the mouth of the prosecutor as the defendants seem to contend.

It is further apparent that the other points raised by defendants regarding evidence and testimony presented to the indicting grand jury as related to alleged misstatements by the prosecutor and Government witness give rise to questions of fact which will more properly be dealt with at trial. It is important to remember that an indictment is only an accusation. "The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).

A motion to dismiss an indictment does not provide a basis for a court trial of the disputed facts to determine whether or not the accused person is in fact guilty. Rather, the question, as posed in this case, is whether there is any cognizable reason to overcome the presumption of regularity which attaches to the grand jury indictment. *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The more specific question posed by movants here is whether they were given the benefit of a fair and unbiased grand jury. Movants have alleged that improperly prejudicial and selective summaries of evidence presented to prior grand juries were the basis of the present indictment and charge for that reason that the indicting grand jury was not fair and unbiased. The allega-

tion of prosecutorial misconduct is founded in claimed prejudicial remarks and knowing use of perjured testimony by the Government.

As earlier stated, it takes a strong and definite showing of such claimed bias and misconduct before an indictment will be upset on the basis of these types of claims.

 The use of summary evidence before a grand jury, in and of itself, is proper. *United States v. Costello*, supra. However, the grand jury cannot be deceived into believing it is receiving direct, rather than hearsay, summary evidence.

■ There are limitations, however, in presentation of summary evidence. Where summary witnesses are used, a problem may arise if the summaries are substantially incomplete. On a general basis the test would seem to be whether the summary is at least a reasonable overview of the subject matter of the evidence presented to the prior grand juries, or is, on the other hand, so outrageously deficient as to constitute a flagrant abuse so that the summary has no reasonable relationship to an understanding of what occurred before the previous grand juries.

More specifically, the test should be that the summary should not in a substantial way misstate relevant and crucial evidence to the extent that the grand jury is so misled that, in reviewing the summary, it cannot be deemed the fair and impartial body to which the accused is entitled.

■ In this case, while there are some errors in the summary testimony given, it cannot be said that there is such a substantial misstatement of the prior evidence that the indicting grand jury was so misled that it could no longer be deemed to be fair and unbiased. There were some things said by the prosecutor to the grand jury which probably would have been better left unsaid. But these statements by no means rise to the level of prosecutorial misconduct. There is no evidence of knowing presentation of perjured testimony, or of an intentional effort to mislead the grand jury. This case does not constitute a proper case for invoking the Court's extraordinary power to dismiss an indictment, either under the Fifth Amendment or pursuant to the Court's inherent supervisory power. Upon consideration of the totality of circumstances present in this case it is clear that the Government did not pollute "the waters of justice", *Mesarosh v. United States*, 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956), in presenting this case to the indicting grand jury. Dismissal of the indictment herein is simply not necessary, "to protect the integrity of the judicial process." Cf. *United States v. Asdrubal-Herrera*, 470 F.Supp. 939 (N.D.Ill.1979).

IT IS HEREBY ORDERED that the within pending motions to dismiss the indictment be DENIED.