UNITED STATES of America,
Plaintiff-Appellant,

v.

Alfred Joseph SAMANGO et al.,
Defendants-Appellees.

No. 78–2297.

United States Court of Appeals,
Ninth Circuit.

Nov. 5, 1979.

As Amended Dec. 13, 1979.

No appearance for the United States.

Brook Hart, Honolulu, Hawaii, F. Lee Bailey, Boston, Mass., Robert L. Shapiro, Los Angeles, Cal., George W. Dixon, Tacoma, Wash., Stephen D. Quinn, Honolulu, Hawaii, for defendants-appellees.

Before ELY and GOODWIN, Circuit Judges, and EAST,* District Judge.

EAST, District Judge:

The Government appeals from an order dismissing a Superseding Indictment returned by a federal Grand Jury for the District of Hawaii on December 19, 1977.[1] We affirm.

*GRAND JURY PROCEEDINGS*

On May 5, 1975, Dionisia Ferrer arrived in Honolulu from Tahiti with 13½ pounds of cocaine concealed in the false bottoms of two suitcases. On August 29, 1975, she was indicted. The grand jury, after indicting Ferrer, took further testimony on possible drug smuggling conspiracies but failed to return indictments for conspiracy. As part of this continuing investigation, Samango appeared before the grand jury on March 19, 1976.[2]

At the outset of Samango's testimony, the prosecutor gave the grand jury a lengthy and heated account of the Government's dissatisfaction with Samango's per-

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. The District Court's Decision is published at 450 F.Supp. 1097 (D.Hawaii 1978).

2. The same prosecutor conducted the examination at all grand jury proceedings involved in this case.

formance under a nonprosecution agreement. When Samango requested to confer with his attorney after the first question relating to the subject of the investigation, the prosecutor responded:

> "Mr. Samango, do you intend to confer with him question by question? Just so we know what the timing is here. We have got a lot of business to do and if you intend to do that then it's going to frustrate the proceedings and we have to take some other course of action."

Instead of questioning Samango directly concerning his admitted acquaintance with several of the defendants, the prosecutor dwelled on Samango's alleged statements to DEA Agent Joel Wong on October 29, 1975 —statements which Samango repeatedly denied or could not recall having made.[3] One such question was: "Did you tell Mr. Wong on that same date, the 29th of October, that everyone is afraid of Joe [Avila] because he is capable of killing people?" The prosecutor also questioned Samango extensively concerning his dealings with a businessman the Government suspected of financing cocaine purchases—dealings Samango continuously characterized as legitimate.[4] The prosecutor insinuated that Samango was lying and stated that if he refused to testify he would be charged as a defendant. They bickered at length over Samango's failure to cooperate to the Government's satisfaction. Samango eventually asserted his Fifth Amendment privilege.

On September 14, 1977, a second grand jury reviewed the transcript of Samango's testimony before the first grand jury and transcripts from related grand jury proceedings, and received live testimony from Wong, defendant Stephen Granat, and others. Granat's testimony consisted almost exclusively of monosyllabic affirmance or denial of the prosecutor's statements and leading questions. The prosecutor even elicited unthinking agreement to several of his own erroneous calculations of profits from drug deals. On the same day, the grand jury returned an indictment, later characterized by the District Court as an "embarrassment." The hearing on defendants' motion to dismiss the indictment was scheduled for December 21, 1977.

On December 12, 1977, in an attempt to get a "sanitized" indictment, the prosecutor left an accumulated 1,000 pages of transcripts and a prepared Superseding Indictment with a third grand jury and informed them off the record that he had a December 20th deadline. The third grand jury also heard live testimony from one witness, Wong. Wong's testimony, laden with conclusions concerning the guilt of several defendants, summarized the DEA's investigation, much of which he had not been involved with personally. On December 19, 1977, the third grand jury returned its Superseding Indictment which was identical to the original.

Count I of the Superseding Indictment charged named defendants with conspiracy to knowingly and intentionally import, to knowingly and intentionally possess with intent to distribute, and to knowingly and intentionally distribute cocaine. 21 U.S.C. §§ 841(a)(1), 846, 952, 960 and 963. The indictment alleged 125 overt acts from October 15, 1974, to October 8, 1975, in furtherance of the conspiracy. Count II charged six of the defendants with importation of cocaine. 21 U.S.C. § 952(a). Count III charged Alfred Joseph Samango and Joe Cerda Avila with continuing criminal enterprise. 21 U.S.C. § 848.

---

**3.** On December 19, 1977, the day the third grand jury heard Agent Wong's testimony and returned its indictment, a juror asked to see a transcript of Samango's statements to Wong. The prosecutor refused, explaining that Samango had not been given his *Miranda* warnings and that his statements were, therefore, inadmissible. Regardless of the accuracy of the prosecutor's conclusion, his conviction had not stopped him from conveying the full content of those statements himself in the leading questions he put to Samango.

**4.** Agent Wong would later testify before the third grand jury that the Government has been trying to implicate this businessman but did not have enough evidence and needed someone like Samango to admit the man provided money, knowing it would be used for cocaine.

## DISTRICT COURT PROCEEDINGS

On March 7, 1978, the District Court orally granted defendants' motion to dismiss the indictment. The oral ruling was recorded in the criminal docket. On May 16, the District Court's written decision and order dismissing the indictment were entered in the criminal docket. The Government filed its notice of appeal on June 14, 1978.

## ISSUES

1. Whether this Court lacks jurisdiction because the Government's notice of appeal was untimely.

2. Whether the District Court properly dismissed the Superseding Indictment for grand jury bias created by the evidence presented by the Government's manner of presentation.

## DISCUSSION

### 1. Timeliness of Appeal

■ Rule 4(b) of the Federal Rules of Appellate Procedure reads:

"(b) Appeals in Criminal Cases . . . When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after the entry of the judgment or order appealed from. A judgment or order is entered within the

meaning of this subdivision when it is entered in the criminal docket. . . ." "Compliance with Rule 4(b) is both mandatory and jurisdictional." *United States v. Stolarz*, 547 F.2d 108, 109–10 (9th Cir. 1976). *See also United States v. Robinson*, 361 U.S. 220, 224, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960).

■ The District Court's oral ruling on March 7, 1978, was not intended to be final. The Court repeatedly expressed its intention to issue a written order incorporating and elucidating its March 7th ruling. The written order was entered 70 days after the oral ruling. Although there could be occasions when an informal oral order, which was intended to be final and was noted in the docket, would commence the time period within which notice of appeal must be filed, this case is not one of those occasions. *See, e. g., Carnes v. United States*, 279 F.2d 378, 379–80 (10th Cir. 1960) (dictum).[5] The order was entered in the criminal docket on May 16, 1978. The Government's June 14th notice of appeal was, therefore, timely.

### 2. Grand Jury Bias

■ We note at the outset that the indictment in this case was not dismissed on the grounds of insufficient or incompetent evidence.[6] Here the defendants contend

---

5. *Carnes* also said: "But if it is not clearly indicated that the Judge's act was intended to be his final act in the case, and if it appears that a formal judgment is comtemplated, then the time for appeal does not begin to run." 279 F.2d at 380. We agree.

6. "It has been repeatedly stated and well established that an indictment cannot be attacked on the ground that evidence before the grand jury was incompetent or inadequate. *Costello v. United States*, (1956) 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; *Lawn v. United States*, (1958) 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321; *Huerta v. United States*, (9 Cir. 1963) 322 F.2d 1; *Johnson v. United States*, (9 Cir. 1968) 404 F.2d 1069; *Wood v. United States*, (9 Cir. 1968) 405 F.2d 423." *Reyes v. United States*, 417 F.2d 916, 919 (9th Cir. 1969).
An indictment based solely on hearsay evidence does not violate the Fifth Amendment; nothing more is constitutionally required of an indictment than that it be "returned by a legally constituted and unbiased grand jury." *Cos-*

*tello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). The Ninth Circuit in *United States v. Chanen*, 549 F.2d 1306, 1311 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977), expressly rejected the Second Circuit's rule authorizing dismissals of indictments if hearsay alone was deliberately used when better evidence was available. *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972); *United States v. Arcuri*, 405 F.2d 691, 693 (2d Cir. 1968), *cert. denied*, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969); *United States v. Umans*, 368 F.2d 725, 730 (2d Cir. 1966), *cert. dismissed as improvidently granted*, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967). Despite some broad language in *United States v. Fox*, 425 F.2d 996, 1001 (9th Cir. 1970), the District Court does not seem to have the discretion to dismiss an indictment merely because some incompetent evidence was admitted. "[O]nly in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment returned

that the prosecutor's behavior was so improper and prejudicial that it created a biased grand jury.. They ask this Court to affirm the District Court's dismissal as a legitimate exercise of the Court's supervisory power or, in the alternative, because it would be a violation of due process to try the defendants on an indictment returned by a biased grand jury.

■ The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked. Courts are rightly reluctant to encroach on the constitutionally-based independence of the prosecutor and grand jury. The Court "will not interfere with the Attorney General's prosecutorial discretion unless it is abused to such an extent as to be arbitrary and capricious and violative of due process." *United States v. Welch,* 572 F.2d 1359, 1360 (9th Cir.), *cert. denied,* 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978). Nevertheless:

"On occasion, and in widely-varying factual contexts, federal courts have dismissed indictments because of the way in which the prosecution sought and secured the charges from the grand jury. . . These dismissals have been based either on constitutional grounds or on the court's inherent supervisory powers. . . Whatever the basis of the dismissal, however, the courts' goal has been the same, 'to protect the integrity of the judicial process,' . . . particularly the functions of the grand jury, from unfair or improper prosecutorial conduct." (Citations and footnotes omitted.) *Chanen,* 549 F.2d at 1309.

For the reasons later stated, we do not in this cause reach the constitutional issue of due process infringement.

■ The District Court's role as an overseer of the grand jury is limited, and it "may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the [prosecutor and grand jury] unless there is a clear basis in fact and law for doing so." *Chanen* at 1313.

In *Chanen,* the Court of Appeals reversed the dismissal of an indictment in circumstances superficially similar to the present case. Like the case at bar, *Chanen* involved three separate grand juries and two indictments. The second indictment was obtained by presentation of only hearsay evidence. Nevertheless, the Court found no fundamental unfairness nor threat to the integrity of the judicial process. The facts in *Chanen* were significantly different from the facts in this case in the following respects: (1) the transcripts of testimony before previous grand juries were read aloud to the third grand jury in *Chanen*; (2) the prosecutor advised the *Chanen* grand jury that the witnesses had made statements inconsistent with their testimony; and (3) the transcripts included confessions that the witnesses had submitted false affidavits. In other words, the grand jury was alerted to the credibility problem, and the Court was assured that the jurors actually heard the evidence.

In the instant case, on the other hand, the lengthy transcripts were merely deposited with the grand jury, and the record does not show how much time the jurors spent with the transcripts nor whether they read them at all. Indeed, there are indications in the record of their proceedings that some of the jurors were not familiar with the contents of those transcripts. Furthermore, the prosecutor knew but did not warn the grand jury of Stephen Granat's doubtful credibility, nor apparently did he apprise them that they could subpoena his live testimony. In fact, the false appearance that the transcribed conversation gives of a smooth, steady flow of information could have lulled the jurors into accepting the testimony as true, without actually noticing that it was the prosecutor who was supplying the testimony. The prosecutor knew Granat's history of extensive drug abuse. Although the District Court had denied the defendants' motion for a psychiatric examination of Granat "as a matter of judicial economy," deferring the matter to a later time, the Court stated that "there were

by an apparently unbiased grand jury." *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).

substantial reasons to doubt Stephen Granat's previous testimony" and that the prosecutor was warned "that Granat's live testimony before a third grand jury might be essential. It was." 450 F.Supp. at 1105. The prosecutor should have attempted to present live testimony from Granat, who was in custody, thereby enabling the grand jury to observe this demeanor and determine on its own whether Granat was a credible witness.[7]

■ We acknowledge that "The grand jury need not be advised of all matters bearing on the credibility of potential witnesses. Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way, as where perjured testimony has knowingly been presented . . . ."[8] *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978). *See also Jack v. United States,* 409 F.2d 522 (9th Cir. 1969), and *Loraine v. United States,* 396 F.2d 335 (9th Cir. 1968). We believe, however, that the grand jury in this instance was overreached and that a line must be drawn beyond which a prosecutor's control over a cooperative grand jury may not extend. Although deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role.[9]

In *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), the Supreme Court discussed the ancient and solemn responsibilities of the grand jury:

"The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury.' *Cf. Costello v. United States,* 350 U.S. 359, 361–362 [, 76 S.Ct. 406, 100 L.Ed. 397] (1956). The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *Branzburg v. Hayes,* 408 U.S. 665, 686–687 [, 92 S.Ct. 2646, 33 L.Ed.2d 626] (1972)." (Footnote omitted).

■ "[U]nder the constitutional scheme, the grand jury is not and should not be captive to any of the three branches." *Chanen,* 549 F.2d at 1312. If the grand jury is to accomplish either of its functions, independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions, limits must be set on the manipulation of grand juries by over-zealous prosecutors.

The prosecutor in this case on December 12, 1977, had a conversation with the grand jury foreperson off the record. He stated

---

7. "At a minimum, the government attorney was obligated to provide some guidance as to how the jurors should utilize the . . . transcripts in determining whether or not an indictment should be returned. To be sure, the jurors realized that they were not going to hear from a live witness. Yet, it cannot be assumed that they possessed the astuteness to evaluate properly the reliability and trustworthiness of the hearsay evidence." *United States v. Gallo,* 394 F.Supp. 310, 315 (D.Conn.1975).

8. "If evidence exists, however, which casts serious doubt on the credibility of testimony which the jurors are asked to rely upon in finding an indictment, the prosecutor has an ethical duty to bring it to their attention." 8 Moore's Federal Practice ¶ 6.03[2], at 6–41 (2d ed. 1978).

9. Let us keep in mind Justice Brandeis' warning: "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928) (dissent).

to the District Court that he told her that he was presenting the grand jury with evidence in a case and that he would like them to reach a conclusion by December 20. He also offered to prepare a proposed indictment. On the same day, he left nine transcripts and the proposed indictment with the grand jury.

The Alfred Samango transcript consisted of grand jury testimony given nearly two years earlier on March 19, 1976. Since his testimony was in written form, the prosecutor obviously knew before he presented it exactly what it contained. He admitted to the Court that there was nothing in the transcript that he needed to get an indictment. He knew Samango had refused to answer questions, asserting his Fifth Amendment right against self-incrimination, and that he did not contribute any useful information for the grand jury's investigation. The transcript was an impressive repertory of insults and insinuations. It contained much testimony by the prosecutor in the form of questions which were usually denied and definitely conveyed the prosecutor's belief that Samango was guilty and evasive. Moreover, the prosecutor's gratuitous question about Joe Avila being capable of killing people was totally irrelevant and extremely prejudicial. We agree with the District Court that submission of the Samango transcript to the grand jury "served no other purpose than calculated prejudice." 450 F.Supp. at 1106.[10]

The transcript of Stephen Granat's testimony before the second grand jury was another source of prejudice. The prosecutor questioned Granat in depth about Joe Avila's and Samango's activities dating long before the acts covered by the indictment— activities which Granat could not have known anything about from his own knowledge. Although Granat was cooperative, his testimony was deceiving. Whether the consequence of drugs or otherwise, Granat's answers to the prosecutor's leading ques-

tions were vague and contradictory. He was trying to please and agreed to anything. For example:

"Q. Can you put a date on this trip?

A. Late January, March.

Q. January 25th?

A. Yes, as good as any."

Sometimes he answered "no" or that he couldn't recall, but throughout the questioning, it was the prosecutor who actually supplied the testimony. Adding to the confusion, they sometimes referred to "Avila" without specifying Joe or his brother, Sergio. A quick reading of the transcript would expose the jurors to abundant damaging information, but would not necessarily impress on them Granat's deficiencies as a witness. There are also indications that Granat felt vindictive toward Joe Avila, who he felt had betrayed him.

The danger that the grand jury accepted the transcript too literally is equalled by the danger that they never even read it or that they read it too quickly. Granat's transcript provided the only evidence against several of the allegedly peripheral conspirators. They could have been indicted for no other reason than that the prosecutor included them in the caption of his proposed indictment. The nine-day deadline certainly discouraged thorough, thoughtful, and independent evaluation of the evidence.

The third grand jury also heard live testimony from DEA Agent Joe Wong on the same day that they returned the indictment. Wong described aspects of the investigation that he was not involved with; he reported events which he could not have observed; and he drew frequent conclusions concerning the guilt of several of the defendants and who was or was not the "number one boy in this conspiracy." The hearsay nature of his testimony would not necessarily be apparent to the grand jurors, who might have been misled into thinking Wong was describing his own observations.

10. Asking questions solely to discredit a witness was held to be prosecutorial misconduct in *United States v. DiGrazia*, 213 F.Supp. 232 (N.D.Ill.1963). Like Samango, the witness in *DiGrazia* gave no incriminating testimony, but the prosecutor "by the form and manner of his questioning, prejudiced her in the eyes of that panel, thereby inducing the return of the indictment." 213 F.Supp. at 234.

884

Wong's testimony alerts us to several other problems as well. At one point, a grand juror asked if Samango would be called to testify again. At another point, one asked why Avila was not subpoenaed. A reasonable implication of these questions is that the grand jurors did not know it was within the grand jury's power to call witnesses, and the only live witness offered by the prosecutor was Wong. Samango, Avila, and Granat are referred to in the testimony as "defendants." The discussion goes off the record in several instances. The prosecutor and Wong repeat once again for the grand jury the tedious tale of Samango's abortive attempt to cooperate—of how he was "hedging," in Wong's terms.

The cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury.

"The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. . . .

". . . The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away . . . ." (Footnote omitted). *Stirone v. United States,* 361 U.S. 212, 218–19, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960).

"Neither by depriving the grand jury of its opportunity to evaluate the credibility of witnesses nor by making prejudicial remarks to sway the grand jury may the prosecutor deny the accused this substantial right." *Gallo,* 394 F.Supp. at 314.

The prosecutor has a duty of good faith to the Court, the grand jury, and the defendant. *United States v. Basurto,* 497 F.2d 781, 786 (9th Cir. 1974). In *Basurto,* this Court held that the defendants' right to due process was violated where they had to stand trial on an indictment which the Government knew was based partially on perjured testimony. Furthermore, trial on such an indictment failed to comport with "fastidious regard for the honor of the administration of justice." Id. at 787, quoting *Communist Party v. Subversive Activities Control Board,* 351 U.S. 115, 124, 76 S.Ct. 663, 100 L.Ed. 1003 (1956). Judge Hufstedler concurred with the majority's result in *Basurto,* but objected to the constitutional basis for the decision. She relied on the Court's power to supervise the administration of criminal justice, which power extends to grand jury proceedings. *Basurto,* 497 F.2d at 793. "An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice." *Id.* The power of the Court to dismiss an indictment for prosecutorial misconduct, on the basis of its supervisory powers was reaffirmed in *United States v. Owen,* 580 F.2d 365, 367 (9th Cir. 1978):

"Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct. . . . As such, dismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature. . . ." (Citations omitted). *See also* Wright, Federal Practice and Procedure § 101 at 151.

The facts of each case determine when Government conduct has placed in jeopardy the integrity of the criminal justice system. Although no perjury has been alleged in the present case, we believe the prosecutor's behavior has exceeded the limits of acceptability.

In *United States v. Polizzi,* 500 F.2d 856 (9th Cir. 1974), this Court rejected a claim that comments made by the prosecutor created grand jury bias. The Court noted that "it takes very substantial evidence of grand jury bias for an appellate court to reverse a conviction because of an indictment returned by an allegedly biased grand jury." *Id.* at 888 n. 55. We are not reversing a conviction, but merely affirming a supervisory act of the District Court which is well-supported by the evidence of record.

We conclude and hold that the manner in which the prosecution obtained the indictment represented a serious threat to the integrity of the judicial process. The District Court's dismissal, therefore, was a proper exercise of its supervisory power.

AFFIRMED.