**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard D. FRITZ; Leonard Levy; and Robert L. Boynton,**
**Defendants–Appellants.**

**Nos. 87–1102, 87–1230 and 87–1231.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1988.

Decided July 27, 1988.

Robert E. Carey, Jr., Carey & Carey, Palo Alto, Cal., for defendant-appellant Levy.

Frank R. Ubhaus, Ubhaus & Collins, San Jose, Cal., for defendant-appellant Boynton.

H. David Grunbaum, Asst. Federal Public Defender, San Jose, Cal., for defendant-appellant Fritz.

Joseph M. Burton, Asst. U.S. Atty., San Jose, Cal., for plaintiff-appellee.

Before SKOPIL and NOONAN,[*] Circuit Judges, and BURNS,[**] District Judge.

NOONAN, Circuit Judge:

Richard D. Fritz, Leonard Levy and Robert L. Boynton moved to dismiss an indictment against them on the ground of misconduct by the prosecutor before the grand jury. The district court denied their motion. They appeal.

---

[*] Judge Noonan has been drawn to replace Judge Anderson in this case.

[**] Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

*Proceedings.* On August 5, 1986 the grand jury returned the indictment, which alleged the following: Boynton was Executive Vice President and Cashier of the Bank of Carmel (the Bank), a national bank insured by the Federal Deposit Insurance Company with a total capital of about $6 million. Boynton was also President and Chief Executive Officer of Carmel Bancorporation, the owner of the Bank. Fritz was Senior Vice President and Loan Administrator of the Bank. Levy was a borrower from the Bank. The Bank had a legal lending limit for individual loans of $600,000. The Board of Directors could approve loans up to that amount. The three defendants engaged in a scheme to defraud the Bank of money by lending Levy money without regard to the Bank's policies and federal regulations. In return for Boynton's and Fritz's cooperation, Levy was to help them gain control of Monterey County Bank.

The details of the scheme as set out in the indictment were these: Between January 17, 1984 and March 19, 1984 Boynton and Fritz made the Bank disburse $1 million to Levy without collateral, interest, or written obligation to repay, with the loans being concealed by false entries. Between January 23 and January 25, 1984 Boynton made the Bank disburse $640,000 to help Levy buy the stock of Information Displays Incorporated (IDI). Without the consent of the Bank's Board of Directors, between February 9 and February 28, 1984, in an effort to purchase a controlling share of Monterey County Bank, Boynton made the Bank give Levy $731,000 and made false entries in regard to this advance. Between March 12 and March 19, 1984, Boynton made the Bank disburse $960,000 to Levy, and Boynton and Fritz covered this disbursement by false entries. On March 23 Boynton and Fritz approved a loan to Levy of $6 million without the consent of the directors and in violation of the legal lending limit of the Bank. The loan was misleadingly recorded as 12 separate loans of $500,000 each to Jarnel Financial Services, A–L, partnerships in which Levy purported to be the general partner although no such partnerships existed. The $6 million loan

was disbursed "without an adequate assessment of the collateral offered" and "without the filing and recordation of the deed of trust allegedly securing the loan"; the security was a deed of trust to property in Sand City and Monterey, California that Levy had no authority to encumber; the $6 million loan was concealed from the Board of Directors until April 3, 1984 and then was misrepresented to the Board of Directors as a loan to 12 separate entities and not to a single individual.

These allegations were incorporated by reference in Counts 1 through 4 which then specifically charged the three defendants with committing wire fraud in violation of 18 U.S.C. § 1343 by transferring $238,428 on February 1, 1984 by wire in interstate commerce; by transferring $237,061 on the same day in the same way; by transferring $918,792.50 on March 26, 1984 in the same way; and by transferring $1,009,673.61 on April 12, 1984 in the same way.

Boynton and Fritz were further charged in Counts 5 through 17 with the misapplication of bank funds in violation of 18 U.S.C. §§ 656, 2 by causing the Bank to transfer specific sums to Levy between January 17, 1984 March 23, 1984, culminating on March 23 in a loan of $6 million made to Levy.

Levy was charged alone with two counts of making false statements on a loan application in violation of 18 U.S.C. § 1014 by stating on March 20, 1984 that he was a general partner of Jarnel Financial Services (an allegedly non-existent partnership) and by stating on October 6, 1983 that he assigned certain property which he had no authority to assign.

The defendants each moved for dismissal of the indictment on the grounds of prosecutorial misconduct. These grounds will be examined below.

## APPEALABILITY OF THE ORDER

■ The district court's decision is on an issue collateral to the merits; it fully disposes of the question; and it involves an important right which would be "lost, probably irreparably" if review had to await an appeal from final judgment on the merits.

Consequently the order is appealable. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). The principle of *Cohen* applies in a criminal proceeding as in a civil one. *Abney v. United States*, 431 U.S. 651, 659 n. 4, 97 S.Ct. 2034, 2040 n. 4, 52 L.Ed.2d 651 (1977). We have jurisdiction to review before a decision on the merits claims that misconduct by the prosecutor has undermined the integrity of the grand jury's proceedings. *United States v. Dederich*, 825 F.2d 1317, 1320–21 (9th Cir.1987).

## STANDARD OF REVIEW

Our cases are divided as to standards for reviewing a district court's refusal to dismiss an indictment for alleged prosecutorial misconduct. *Compare United States v. Gonzalez*, 800 F.2d 895, 899 (9th Cir.1986) (standard is abuse of discretion) *with United States v. De Rosa*, 783 F.2d 1401, 1404 (9th Cir.) (standard is de novo), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed. 2d 571 (1986). Without choosing between the standards we hold that in this case under either standard the judgment of the district court should be affirmed.

## THE MISCONDUCT CLAIMED BY THE DEFENDANTS

1. Nancy Lee Zarzana, an employee in the bank note department, testified before the grand jury that the Jarnel partnership loans for $6 million were made between March 23 through March 28, 1984. She testified that they were secured by property at 1131 Dolphin Terrace, Corona Del Mar, California. She said that she thought the property was Levy's residence. She implied that there was no appraisal or title report on the property in the loan files. In fact there was an appraisal and a preliminary title report in the files. In fact the property offered as security was beach front lots in Sand City that Levy was developing.

2. Joseph M. Burton, the Assistant United States Attorney presenting the case to the grand jury, told the grand jury that the Jarnel partnership loans were made on January 23, 1984. In fact they were made between March 23 and March 28, 1984.

3. Burton told the grand jury that the Sand City property used as collateral was worth "perhaps four million dollars." No testimony was presented as to what the property was actually worth.

4. Burton told the grand jury that the lending limit of the Bank was $600,000 but, the defendants contend, the lending limit to any one entity was $1 million.

5. Burton questioned a director of the Board, Zigmont LeTowt, on notes relating to a meeting held by the Bank's Board of Directors. The notes contained the words, "Drug money." In answer to the prosecutor's question, "Do you remember any discussion about anything along those lines at any meeting or anything that you were at?" LeTowt answered, "[W]e were imagining all kinds of things that could have been involved in this nightmare in which we found ourselves involved, and there was substantial speculation about whether Levy was connected with organized crime or the Mafia or he was a professional con artist." In answer to a follow up question LeTowt testified, "I didn't have any inclination then, nor do I now, nor in between have I, any of the slightest suspicion or information on anything about drugs. It was just my own impression early and still is that Levy was a con artist."

6. A grand juror asked Burton as to Levy, "You see a charge that we could hold against him?" Burton replied, "Absolutely," and in response to a follow-up question stated that the proposed indictment would include charges of mail fraud and false statements on a loan application. He further said that the case as to Levy was a little harder than as to Boynton and Fritz, "but easy, also."

7. A grand juror asked as to Levy, "But that he has a Swiss bank account or something like that, it's possible?" Burton replied, "Yes. Yes."

8. The prosecutor did not present to the grand jury various alleged facts that, if true, might have been exculpatory: Levy had initiated an investigation by the Securities Exchange Commission as to IDI where

he had lost money on investments and he had voluntarily appeared before the Securities Exchange Commission; Levy desired to appear before the grand jury and claims to have had an agreement with the prosecution that he would be allowed to testify; there was an appraisal of the Sand City property estimating its value between $14 million and $16 million; Dr. Satinder Swaroop had retracted statements about Levy that he had earlier made to Special Agent James Key who had testified as to the earlier statements to the grand jury.

### ANALYSIS

 A person under investigation by a grand jury has no right to appear before the grand jury. *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645, 648 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). By the same token he has no right to have exculpatory evidence presented. *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir.1987); *United States v. Al Mudarris,* 695 F.2d 1182, 1185 (9th Cir.), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983). The record does not support Levy's claim that he had an agreement with the prosecutor that he would be called. The claim that there was misconduct in not presenting the evidence Levy would have liked to have presented is baseless.

The contention that the prosecutor misbehaved in his questioning of LeTowt is equally baseless. He enlisted from LeTowt the unequivocal statement that LeTowt did not know that drug money was involved. LeTowt's subsequent speculation, giving his personal opinion of Levy, was unsolicited by the prosecutor. The prosecutor's own speculation about the Swiss bank account did not go beyond the realm of what was possible. The speculation should not have been engaged in; it was not fatal. As to Swaroop, his alleged retractions came nearly seven months after the indictment was returned.

Zarzana's mistakes about the security for the $6 million loan were harmless. The exhibit before the grand jury showed that the collateral was the Sand City property.

Zarzana subsequently corrected her mistaken statement by saying, "I guess I shouldn't have specified residence because I really don't know that." A grand juror pointed out to her that there were "a lot of properties at that address as though it were some kind of major development." The indictment correctly specified the collateral that had been used.

The prosecutor did make mistakes in misstating the date of the loans and in saying the collateral for the Jarnel loan was worth $4 million but the mistakes do not appear to be deliberate, and they were not egregious. Zarzana had given a misleading impression that the Bank had been furnished no appraisal of the property. But Exhibit 23 before the grand jury and the minutes of the Board of Directors' meeting of April 21, 1984 showed that the Board was aware of the property and the property was estimated to be worth $5 million, still a great deal under the amount loaned. The grand jury was also aware that Levy's own appraisal was that the property was worth $16 million.

In summary, neither individually nor taken cumulatively do the few mistakes of the prosecutor and Zarzana amount to flagrant deception or overreaching of a grand jury. *Compare United States v. Samango,* 607 F.2d 877, 882 (9th Cir.1979). The concrete facts alleged in the indictment are untainted by the errors that crept into the grand jury proceedings. There is no reason to dismiss the indictment. *See Bank of Nova Scotia v. United States,* —— U.S. ——, 108 S.Ct. 2369, 2372, 101 L.Ed.2d 228 (1988) (no dismissal of indictment for errors in grand jury proceedings unless such errors prejudiced the defendants). The case may proceed to trial.

AFFIRMED.