IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MICHAEL SOTO, *Petitioner*,

*v.*

STATE OF ARIZONA ex rel. RACHEL MITCHELL,
Maricopa County Attorney, *Respondent*.

No. 1 CA-SA 25-0250

FILED 03-16-2026

Petition for Special Action from the Superior Court in Maricopa County
No. CR2025-006306-001
The Honorable Aryeh D. Schwartz, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED; REMAND**

COUNSEL

Maricopa County Public Defender's Office, Phoenix
By Albert H. Duncan
*Counsel for Petitioner*

Maricopa County Attorney's Office, Phoenix
By Quinton S. Gregory
*Counsel for Respondent*

**OPINION**

Presiding Judge David B. Gass delivered the opinion of the court, in which
Judge Michael J. Brown and Judge Andrew J. Becke joined.

**G A S S**, Judge:

¶1        Petitioner Michael Soto challenges the superior court's denial of his request to remand criminal charges to the grand jury for a new finding of probable cause.

¶2        Soto argues two issues warrant relief. First, he argues the State used narrative leading and closed-ended questions in presenting the case to the grand jury to the point the State was testifying and the case agent witness was just giving confirmatory answers. Second, he argues the State omitted clearly exculpatory evidence relating to Soto's justification defense under A.R.S. § 13-205.A. Soto argues the State should have told the grand jury about: (1) social media comments from one of the victims about committing a robbery on the night of the shooting; and (2) the amount of firepower the victims used the night of the shooting—more than 70 cartridge casings, including more than 20 casings from an AK-47 rifle.

¶3        The court addresses both issues independently because they both warrant relief and could recur on remand. The court thus accepts special action jurisdiction, grants relief, and remands to the superior court with direction to grant Soto's motion to remand to the grand jury.

## FACTUAL AND PROCEDURAL HISTORY

¶4        The State asked the grand jury to indict Soto on one count of attempt to commit armed robbery, two counts of aggravated assault, and one count of misconduct involving weapons.

I.        **The State's questioning restricted the case agent's ability to provide information, ensuring the case agent witness provided almost no details to the grand jury.**

¶5        The State's sole witness before the grand jury was the case agent. Of the 48 questions the State asked during its initial questioning, 45 were narrative leading or closed-ended questions. The closed-ended questions called for a yes or no answer, and the case agent followed that lead. The case agent answered no twice, when asked: (1) "And is there any evidence that [Soto's] right to possess a firearm has been restored?"; and (2) "Was Soto interviewed that night by law enforcement?" For all but one of the closed-ended questions, the case agent answered yes or gave an equivalent such as "correct," "he does," "he did," or "they did."

¶6        For the other questions, the case agent introduced himself to the grand jury and gave two answers beyond yes or no or its equivalent:

Q: And when we're talking about dropping a pin, what does that mean?

A: Just sending a location, your location to a group or another person on the phone.

. . . .

Q: And what does "run it" mean?

A: It's a street term for a robbery.

## II. The prosecutor's questions, not the case agent's testimony, told the entire story.

¶7 The following shows the State's questions verbatim in the order asked, but the case agent's answers are not provided, because they are described above.

- On January 10, 2025, at about 1:55 a.m. in the morning, did Phoenix police officers respond to a shooting call in the area of 43rd Avenue and Glenrosa? . . .

- Is that in Phoenix within Maricopa County? . . .

- When officers arrived, were they informed that two male victims had met at least one male suspect to sell a gun when a robbery took place? . . .

- And ultimately, did they learn that there was a shooting? . . .

- Were the two male victims that—were two male victims transported to St. Joe's and was another male dropped off at Maryv[ale] Hospital? . . .

- The two males that were dropped off at St. Joe's were they identified as [victim 1 and victim 2]? . . .

- Did [victim 1] have gunshot wounds to the head, legs, and both shoulders? . . .

- And did [victim 2] have gunshot wounds to the face, neck, shoulder, and abdomen? . . .

- The male that was dropped off at Maryv[ale] Hospital, was he identified as Michael Soto? . . .

- Did he have a single gunshot wound to the back? . . .

- When he arrived at Maryv[ale] Hospital, did he have one Croc shoe on? . . .

- And was there another Croc located at the scene of the shooting? . . .

- And I guess it seems like a silly question, but were they opposite feet? . . .

- When [victim 1] was interviewed, did he tell detectives that he was interested in selling his Glock 23 firearm, and so he asked a friend if he knew anyone who would be interested in buying a gun? . . .

- And was that friend [friend 1]? . . .

- And did [friend 1] coordinate a buy between [victim 1] and someone [friend 1] knew who would be interested in purchasing the gun? . . .

- Did [victim 1] initially pick a well-lit location with cameras to sell the firearm? . . .

- And that night did [friend 1] reach out to [victim 1] and say that they couldn't find him? . . .

- And did he put [victim 1], [friend 1], and Michel Soto in a group chat? . . .

- And at that point did Michael Soto drop a pin and ask [victim 1] to come meet them at a different location? . . .

- And was that pin dropped at 4200 West Glenrosa? . . .

- Did [victim 1] ask [victim 2] to go with him, because he thought something was sketchy? . . .

- And when the two arrived, did they meet up with Michael Soto? . . .

4

- And did he say that Michael Soto began counting money so [victim 1] took the gun out of his bag? . . .

- At that point did Soto then say, "Run it" and start shooting him? . . .

- Was [victim 1], at this point, able to get the Glock back and fire a shot at Michael Soto? . . .

- Did he say that he felt his legs getting shot and fell to the ground? . . .

- And did he say that he fired four shots, but was unsure if he hit anyone? . . .

- Did he also tell detectives that there was another gun in the back of his car that he believes [victim 2] grabbed? . . .

- And does he believe that [victim 2] also fired at Michael Soto? . . .

- While [victim 1] was in the hospital, did [friend 1] contact him? . . .

- And did [friend 1] say that he had pictures of the suspect and would cooperate with the investigation? . . .

- And when we're talking about pictures of the suspect, did he identify the suspect or the shooter as Michael Soto? . . .

- When [friend 1] was identified, was he determined to be [friend 1's legal name]? . . .

- And did he tell detectives that Michael Soto wanted to buy a gun and that he knew [victim 1] was selling one so he facilitated the deal between them? . . .

- And when they arrived, did he say that they could not find [victim 1], so he put them in a group chat and Michael Soto dropped a pin? . . .

- Did he also say that he stayed on the phone with [victim 1] during the meet-up and that when he heard shooting and screaming, he hung up so he could call police? . . .

- And was he shown a picture from hospital surveillance at the Maryv[ale] Hospital and did he identify Michael Soto as the person with one Croc in that picture? . . .

- Was Soto interviewed that night by law enforcement? . . .

- Did he, at some point, have a conversation with patrol officers who were investigating why he got dropped off at that hospital? . . .

- And did Soto say that he was in the area of 83rd Avenue and Peoria on January 10, 2025, and that he'd gone to Circle K to buy chips when two suspects got out of an unknown dark-colored vehicle and shot him? . . .

- And did he then say other unknown suspects then transported him to the hospital? . . .

- And did he say that he did not know the address of his girlfriend's house, but that his—her name was [Jane Doe]? . . .

- And is Michael Soto a prohibited possessor by way of juvenile felony adjudication? . . .

- And is there any evidence that his right to possess a firearm has been restored? . . .

### III. The grand jurors asked follow-up questions.

¶8 After the State finished with its questioning, the grand jury had the opportunity to ask questions. A grand juror asked an open-ended question: "What evidence do you have that he [Soto] fired the first shot?" In response, the case agent said, "Just based on what the victim told us."

¶9 Before the grand juror could ask any follow up questions, the prosecutor jumped in with several more narrative closed-ended yes or no questions, though the case agent gave a narrative response to one of them:

Q: To clarify, when [victim 1] was being interviewed, did he say that he was in the process of handing the Glock over to Michael Soto when Michael Soto started shooting?

A: Yes. He had the gun in a bag. He was carrying like a big white shopping bag. Michael started to count the money, so he went to get the gun out of the bag and that's when he said, "Run it" and Michael produced a gun and started firing.

Q: And while this was going on, was the other firearm still in the back of [victim 1's] vehicle?

A: We believe so.

Q: And it's fair to say that [victim 1] believes [victim 2] didn't go get the gun until after he had been shot?

A: Correct.

¶10 Grand jurors asked no further questions after the State's follow up. The grand jurors did ask a few other questions, mostly directed at the misconduct involving weapons allegations. The grand jury then indicted Soto on one count of attempt to commit armed robbery, two counts of aggravated assault, and one count of misconduct involving weapons.

## IV. The State did not offer exculpatory evidence relating to Soto's justification defense.

¶11 The State did not tell the grand jury victim 1 posted about planning to do a "lic" on his Instagram account on the night of the shooting, the same victim who told the police Soto tried to rob them and shot first. The State did not tell the grand jury "lic" is slang for a robbery. And though the State made sure the grand jury knew that Soto was buying a Glock, the State did not tell the grand jury the gun in the backseat of victim 1's vehicle was an AK-47 assault rifle, which the police later recovered at the scene.

¶12 True, the State told the grand jury victim 1 said he thought he used the Glock to shoot at Soto four times. But the State did not tell the grand jury the police found more than 70 cartridge casings at the scene, more than 20 of which came from an AK-47 assault rifle. This is the same type of rifle victim 1 believed victim 2 retrieved from victim 1's car, and the same type of rifle victim 1 believed victim 2 fired at Soto.

**V.      The superior court denied Soto's motion seeking a remand to the grand jury for a new finding of probable cause.**

¶13      Soto moved to remand to the grand jury a new finding of probable cause. After briefing and oral argument, the superior court denied Soto's motion, saying in part:

> [T]he Court finds the prosecutor did not fail to make a fair and impartial presentation to the grand jury. The Court appreciates that conducting an examination with so many leading questions and/or questions that result in a "Yes" answer may make it seem like the prosecutor is testifying, but the witness could have answered "No" to any incorrectly-framed question or otherwise disagree with it. There is no indication that the manner in which the examination was conducted was not impartial, nor is there any indication that the manner in which the examination was conducted was material to the grand jury's decision.
>
> As to the content of the witness's testimony, the Court does not find that the prosecutor failed to provide clearly exculpatory evidence. The presence of more expended casings at the scene, some of them fired from a rifle, and the presence of bullet fragments at the scene do not constitute clearly exculpatory evidence. As noted above, the prosecutor was obligated to present only clearly exculpatory evidence, not all conceivable exculpatory evidence. Further, any inconsistent statements or testimony given by the witness would bear upon his credibility and the weight of the evidence, which are issues for the trier of fact to determine.

¶14      Soto moved to reconsider, which the superior court denied without a response. Soto then timely filed this petition for special action.

## SPECIAL ACTION JURISDICTION

¶15      Soto challenges the grand jury's findings of probable cause. Because grand jury proceedings generally are not subject to review on direct appeal, Soto must pursue any relief by motion at the superior court and by special action at the appellate level. *State v. Moody*, 208 Ariz. 424, 439–40 ¶ 31 (2004) (limiting direct appeal review of grand jury procedure to when a "defendant has had to stand trial on an indictment which the government knew was based partially on perjured, material testimony").

The State does not dispute special action jurisdiction is appropriate when a defendant challenges grand jury proceedings.

**¶16**    Though "highly discretionary," special action jurisdiction is appropriate when no "equally plain, speedy, and adequate remedy by appeal exists." *Prosise v. Kottke*, 249 Ariz. 75, 77 ¶ 10 (App. 2020) (cleaned up). Because special action review is the only way Soto may obtain relief, the court exercises its discretion and accepts special action jurisdiction. *Id.* ¶ 11; Ariz. R.P. Spec. Act. 2(b)(2).

## DISCUSSION

**¶17**    Under Rule 12.9(a), Arizona Rules of Criminal Procedure, "a defendant may challenge a grand jury proceeding only by filing a motion for a new finding of probable cause alleging that the defendant was denied a substantial procedural right or that an insufficient number of qualified grand jurors concurred in the indictment." To honor a defendant's procedural rights, due process requires the State to present "an accurate picture of the substantive facts in both the initial grand jury proceeding and on remand." *Herrell v. Sargeant*, 189 Ariz. 627, 631 (1997). "[T]he failure to fairly and impartially present evidence to a grand jury is the denial of a substantial procedural right guaranteed by the Arizona Constitution." *Willis v. Bernini*, 253 Ariz. 453, 460 ¶ 23 (2022).

**¶18**    Soto argues the State's presentment here lacked fairness and impartiality. He argues the State's almost exclusive use of lengthy, detailed, leading and closed-ended questions, and the witness's single-word, single syllable answers shows the State, not the witness, testified. And Soto argues the State's questions ensured the grand jury did not hear clearly exculpatory evidence of justification, leaving the grand jury with an "inaccurate picture of the substantive facts." *Herrell*, 189 Ariz. at 631.

**¶19**    The State argues the State's use of narrative leading and closed-ended questions does not require a remand to the grand jury. The State also argues the evidence on which Soto relies is not "relevant to his charges at all, much less that the grand jury would have refused to indict him had they possessed the information."

**¶20**    The court reviews for abuse of discretion the denial of a motion to remand to the grand jury. *Willis*, 253 Ariz. at 458 ¶ 14. A superior court abuses its discretion if it makes an error of law "in reaching a discretionary conclusion." *State v. Strong*, 258 Ariz. 184, 208 ¶ 97 (2024). An error of law means the misapplication of law or legal principles. *See State v. Mohajerin*, 226 Ariz. 103, 112 ¶ 18 (App. 2010). When considering the denial

of a request to remand to the grand jury, the court will defer to the superior court's "explicit or implicit factual findings and will affirm those findings if supported by reasonable evidence." *Skaggs v. Fink*, 256 Ariz. 437, 439 ¶ 5 (App. 2023).

**I.  The State's almost exclusive use of narrative leading and closed-ended questions shows the State (and not the case agent) acted as the witness and deflected the grand jury from making a full inquiry.**

**¶21**        Arizona law recognizes the importance of a grand jury's independence. *See* A.R.S. § 21-412 ("The grand jurors shall weigh all the evidence received by them and when they have reasonable ground to believe that other evidence, which is available, will explain away the contemplated charge, they may require the evidence to be produced."). The grand jury's role is to determine whether probable cause exists to believe a crime has been committed and the investigated person committed it. *State v. Sanchez*, 165 Ariz. 164, 171 (App. 1990).

**¶22**        The State's role is to present the evidence fairly and impartially. *See Maretick v. Jarrett*, 204 Ariz. 194 (2003), *Herrell*, 189 Ariz. at 627; *Crimmins v. Superior Ct.*, 137 Ariz. 39 (1983). To that end, the State must present an accurate picture of substantive facts, including the presentment of clearly exculpatory evidence. *See Willis*, 253 Ariz. at 461 ¶ 26. The State must not use the presentment to deflect the grand jury from making a full inquiry. *See Baines v. Superior Ct.*, 142 Ariz. 145, 152 (App. 1984).

**¶23**        Even so, grand jury presentments are not mini trials. *See State v. Baumann*, 125 Ariz. 404, 408–09 (1980). The State need not present all conceivable exculpatory evidence, but if the State fails to present clearly exculpatory evidence to the grand jury, that failure violates a defendant's due process rights. *Willis*, 253 Ariz. at 460–61 ¶¶ 23, 26. Evidence is "clearly exculpatory" if it "would deter the grand jury from finding the existence of probable cause." *Herrell*, 189 Ariz. at 631 (quoting *State v. Superior Ct.*, 139 Ariz. 422, 425 (1984)); *Willis*, 253 Ariz. at 462 ¶ 32; *Hansen v. Chon-Lopez*, 252 Ariz. 250, 256 (App. 2021).

**¶24**        True, the court has said the State may use leading questions in grand jury proceedings. *See Baines*, 142 Ariz. at 152. And that remains true. The same is true of closed-ended questions. But the State must not use such questions to replace actual witness testimony if the result is the prosecutor denies the defendant a substantial procedural right by deflecting the grand jury from making a full inquiry. *See Maretick*, 204 Ariz.

at 197 ¶ 10. In *Maretick*, the court explained the State's role in presenting cases to a grand jury:

> The prosecutor's role before the grand jury is unique in our system. The prosecutor acts not simply as an advocate, but as a minister of justice, who assists the jurors in their inquiry. Prosecutors bear a particularly weighty duty not to influence the jury because the defendant has no representative to watch out for his interests before the grand jury. The prosecutor therefore must not take advantage of his or her role as the ex parte representative of the state before the grand jury to unduly or unfairly influence it. Indeed, the prosecutor must give due deference to the grand jury's status as an independent legal body. Significantly, the initiation and control of questioning rests with the grand jury and not the prosecutor. In other words, the prosecutor's powers are derived from the grand jury; it is the grand jury that possesses the broad investigative powers, and must be the decisionmaker. It is not the prosecutor's role to deflect the grand jury from its inquiry.

*Id.* (cleaned up).

**¶25** *Baines* explained the appropriate use of leading questions: "the proceedings were lengthy and dealt with complex factual situations. Under these circumstances, it is not improper for the prosecutor to utilize leading questions in an effort to clarify the testimony." 142 Ariz. at 152. Though *Baines* did not address the combined use of leading and closed-ended questions, the same issues arise when the State uses the form of the question to capitalize on the State's role and to influence the grand jury unduly or unfairly. *See Maretick*, 204 Ariz. at 197 ¶ 10.

**¶26** The State concedes this case does not involve lengthy proceedings or "complex factual situations" like *Baines*. *Id.* For that reason, the court recognizes Soto's "basis for the contention that the prosecutor 'manipulated' the proceedings by asking leading questions of the [sole] witness[]." *Id.* The question then arises: When does the State cross the line?

**¶27** No Arizona case, including *Baines*, provides meaningful guidance on that question. But federal appellate court decisions do. The Second Circuit expressed concern about a prosecutor's pervasive use of such questions to a grand jury witness:

> [L]eading questions tend to mute one of the chief functions of the grand jury, the evaluation of the strength of the evidence and the credibility of witnesses. And careless instructions, such as those given here, tend to hamper the grand jury's understanding of the importance of evaluating the reliability of the evidence and to discourage it from demanding eye witness testimony.

*United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990). Despite these stated concerns, *Brito* did not remand the case to the grand jury. *Id.* at 395–96.

¶28        On different facts, the Ninth Circuit not only found error, but it also dismissed the indictment outright. *See United States v. Samango*, 607 F.2d 877 (9th Cir. 1979) (addressing the pervasive use of leading questions to obtain an indictment could undermine "the integrity of the judicial process.").

¶29        The State (not the case agent) was the driving force throughout the testimony. The State asked the case agent 48 questions before the grand jury was allowed to ask follow-up questions. Of the 48 questions, 45—nearly all—were either narrative leading or close-ended. And the non-leading, open-ended questions merely sought minor clarifications. This level of leading and close-ended questions tracks with *Samango*, where the "testimony consisted almost exclusively of monosyllabic affirmance or denial of the prosecutor's statements and leading questions." 607 F.2d at 879. "[S]ometimes [the witness] answered 'no' or that he couldn't recall, but throughout the questioning, it was the prosecutor who actually supplied the testimony." *Id.* at 883.

¶30        And the State allowed the grand jurors to ask just one question before interjecting, taking back control, and asking more narrative, leading, and closed-ended questions. The grand juror asked how the witness knew who shot first. The State followed up by asking closed-ended questions to ensure the case agent confirmed victim 1 said Soto fired first, the gun involved was a Glock, and he "believed" victim 1 said victim 2 did not grab the other gun until after Soto started shooting. Those questions also ensured the case agent would not mention victim 1's Instagram post about doing a robbery (a lic) the same night as the shooting, the gun in the backseat of victim 1's car was an AK-47, or the police found over 70 cartridge casings, including over 20 cartridge casings from that AK-47 on the ground where the shooting took place.

¶31 No doubt, the State has some leeway to ask leading and close-ended questions in grand jury examinations. *See Maretick*, 204 Ariz. at 197 ¶ 10. And that leeway precludes the adoption of a bright-line test. Instead, the court must consider the totality of the circumstances to decide whether it was the prosecutor of the witness "who actually supplied the testimony." *See Samango*, 607 F.2d at 883. But the transcript of the State's questions shows just how much the State, not the case agent, told the story. In doing so, the State controlled the narrative and ensured the case agent would make no errant statements supporting Soto's justification defense. And as a result, the grand jury had "a picture of the substantive facts" but not necessarily a fair, impartial, and accurate picture. *See Herrell*, 189 Ariz. at 631.

¶32 The State's presentation here is a disservice to Soto and the grand jury. By using almost exclusively narrative leading and closed-ended questions, the case agent was relegated to confirming the State's statements and avoided key evidence. And when the grand jurors asked questions, the prosecutor jumped in and controlled the follow-up questions. The State cannot use leading and closed-ended questions rather than prepare witnesses for grand jury testimony. And the witnesses, not the State, must provide the evidence, not simply confirm the State's narrative leading and closed-ended questions.

## II. The State failed to sufficiently present relevant and clearly exculpatory evidence.

¶33 Soto argues the State also violated his procedural due process rights by failing to sufficiently present clearly exculpatory evidence. The court agrees.

¶34 Even without a specific request, the State has a duty to present clearly exculpatory evidence to a grand jury. *Willis*, 253 Ariz. at 461 ¶ 26. Though the State need not "present all conceivable exculpatory evidence," the State must present clearly exculpatory evidence to ensure a fair and impartial presentment to the grand jury. *See id.* at 460–61 ¶¶ 23–26.

¶35 *Willis* explained "clearly exculpatory evidence includes evidence relevant to a justification defense that would deter a finding of probable cause." *Id.* at 461–62 ¶¶ 27–32. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." *Id.* at 463 ¶ 34. "[E]vidence relevant to establishing a justification defense is clearly exculpatory" because "a determination that a person's conduct was

justified would deter a grand jury from finding probable cause" once such conduct would not be criminal or unlawful. *Id. Willis* also cited to *Herrell*, in which the Arizona Supreme Court remanded the case to the grand jury for "redetermination of probable cause because, among other reasons, [the S]tate failed to present evidence regarding justification in using force to prevent a crime [the accused] reasonably thought was being committed." *Id.*

¶36        The State did not inform the jury about the number of cartridge casings found at the scene or that over 20 of them were from an AK-47, the same type of rifle victim 2 retrieved from the backseat of victim 1's car. The State also did not have the case agent tell the grand jury about victim 1's Instagram post on the day of the shooting in which victim 1 hinted at doing a robbery, a "lic," that night. For these reasons, this case presents similar heightened concerns to those in *Samango* and thus warrants the relief Soto requests—remand to the grand jury.

¶37        All these pieces of evidence are relevant and clearly exculpatory based on Soto's justification defense. That evidence provides a more accurate representation of the crime scene, and without that evidence, an inaccurate representation. The State's questions constrained the case agent from discussing this clearly exculpatory information while testifying. And without this information, the grand jury did not have all the evidence it should have had to determine who first fired shots, who robbed whom, or the motives of all the individuals involved. It simply could not give any weight to Soto's justification defense.

¶38        On this record, the State violated Soto's procedural due process rights in its presentation of evidence.

## CONCLUSION

¶39        The court grants relief by vacating the superior court's denial of Soto's motion to remand to the grand jury for finding of probable cause. On remand, the court directs the superior court to grant Soto's motion.

